2021 IL App (1st) 192573-U

No. 1-19-2573

Second Division
June 29, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

---

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

---

| | | |
|---|---|---|
| | ) | Appeal from the |
| THE PEOPLE OF THE STATE OF | ) | Circuit Court of |
| ILLINOIS, | ) | Cook County. |
| | ) | |
|     Plaintiff-Appellee, | ) | |
| | ) | No. 13 CR 9116 |
|   v. | ) | |
| | ) | |
| DAMIEN GARZA, | ) | Honorable |
| | ) | James B. Linn |
|     Defendant-Appellant. | ) | Judge, presiding. |

---

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's summary dismissal of defendant's *pro se* postconviction petition is reversed, and the cause is remanded for second stage proceedings where defendant's claim that his aggregate sentence of 50 years' imprisonment violates the proportionate penalties clause of the Illinois Constitution was not frivolous or patently without merit.

¶ 2    Following a jury trial, defendant-appellant, Damien Garza, was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)), aggravated battery (720 ILCS 5/12-3.05(e)(1) (West

2012)), and three counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2012)), and sentenced to an aggregate sentence of 50 years' imprisonment. He now appeals from the judgment of the trial court summarily dismissing his *pro se* petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)). On appeal, defendant, who was 19 years of age at the time of the offense and convicted on a theory of accountability, argues that the trial court erred because his petition set forth the gist of an arguable constitutional claim that his 50-year sentence violated the proportionate penalties clause of the Illinois Constitution. For the following reasons, we reverse and remand for second stage proceedings under the Act.

¶ 3                                    I. BACKGROUND

¶ 4     Defendant was arrested and charged, along with his codefendant Javier Garza (no relation), with multiple counts of first degree murder, attempt first degree murder, aggravated battery, and aggravated discharge of a firearm, in relation to a shooting that occurred on April 7, 2013. As relevant to this appeal, the facts adduced at trial are as follows.

¶ 5     On April 7, 2013, around 3:30 p.m., Emily Guerrero, Alyna Esparza Alec Esparza, Pablo Juarez, and Michael Orozco were walking to an ice cream shop located on Cermak Road and Leavitt Street in Chicago, Illinois. As they were heading north on Leavitt Street, a green minivan stopped across the street from them. Inside the minivan was Jamie Almarez, Javier who was 17 years old at the time, and defendant, the driver of the minivan, who was 19 years old at the time. Javier and defendant, both members of the Latin Saints, displayed gang signs towards the group as a form of disrespect towards a rival gang, the Satan Disciples. In response, Michael, who had been spending time with the Satan Disciples, presented gang signs towards the minivan.

¶ 6     Javier stepped out of the minivan from the sliding back door and shouted "D.K." (which was explained at trial to mean "Disciple Killer"). He then pulled out a black handgun and fired

three to four shots at the group, who all ran away from the gunfire. Javier stopped shooting and stepped back into the minivan. Defendant then drove north.

¶ 7     Three bullets struck Michael in the back. The rest of the group looked back and noticed Michael laying on the ground. Emily and Alyna called 911 and stayed with Michael while the others ran to Michael's house to tell his family about the shooting. Michael's father and brother arrived at the scene, and shortly thereafter, paramedics arrived and transported Michael to the hospital. At the scene, Emily noticed a piece of metal in her leg, which she pulled out and dropped on the street. When Michael's father arrived at the hospital, he was informed that Michael had died from his wounds.

¶ 8     Chicago police officers Manuel Hernandez and Waqar Mian were driving south on Loomis Street, approaching Cermak, in an unmarked squad car when they received a dispatch of shots fired near Cermak and Leavitt. Officer Hernandez activated the emergency lights and siren and drove towards the scene. The officers then received information that a green minivan driving east on Cermak was involved in the shooting, which was confirmed as bona fide. At this point, Officer Hernandez deactivated the sirens and lights so as not to alert the suspects of the police presence as they searched for the minivan. The officers came across a green minivan at the intersection of Cermak and Wood. They passed each other, and Officer Hernandez activated his lights and sirens, made a U-turn, and pursued the minivan as it accelerated at a high rate of speed. Subsequently, the minivan crashed into a group of parked cars and the unmarked squad car was positioned alongside the minivan to prevent escape.

¶ 9     Both officers exited the squad car with their weapons drawn. Officer Hernandez ordered defendant to put his hands up and placed him in handcuffs. Officer Mian observed Javier in the

backseat and Jamie in the front passenger seat. Officer Mian removed Javier and Jamie from the minivan and recovered a "semiautomatic blue steel weapon" underneath the driver's seat.

¶ 10    Not long after the shooting took place, other police officers drove Emily and Alyna to the location where the minivan had crashed. The officers brought two men out, and both Emily and Alyna identified them as the shooter and the driver of the minivan. Later at the police station, they informed detectives of what had transpired. Emily's parents then took her to the hospital to have her leg checked out.

¶ 11    Pablo went to the police station that day where he viewed a physical lineup and identified Javier as the shooter. Alec also spoke to the police but he was unable to identify any of the offenders from a physical lineup. Two other eyewitnesses, Eduardo Dominguez and Jessica Contreras, also viewed a lineup at the police station on the day of the shooting. Dominguez identified Javier based on his clothing but did not see his face at the time of the shooting. Contreras identified defendant as the driver of the minivan. Contreras also spoke with an assistant state's attorney about what she had observed that day. The following day, Emily went back to the police station and spoke with an assistant's state's attorney about the shooting. From photographs, Emily identified Javier as the shooter and defendant as the driver.

¶ 12    Four discharged cartridges, two fired bullets, and several metal bullet fragments were recovered from the scene of the shooting. As stated, the gun, which was a Taurus .45 caliber semiautomatic pistol, was recovered from the minivan. A fired bullet was recovered during Michael's autopsy. A firearms examiner concluded that the discharged cartridges and the bullet were fired from the recovered gun. A gunshot residue test performed on Javier's right hand on the day of the shooting tested positive for gunshot residue.

¶ 13    The jury found defendant guilty of first degree murder, aggravated battery, and three counts of aggravated discharge of a firearm. Defendant's motion for a new trial was denied.

¶ 14    At sentencing, Assistant State's Attorney Jennifer Hanus testified that on October 16, 2012, she was one of the prosecutors involved in the jury trial of Daniel Ramirez, during which defendant was called as a witness for the State. That case involved a shooting which occurred on August 9, 2011. As a witness, defendant testified to his affiliation with the Latin Saints and stated that on that day, he was driving a car with his girlfriend as the passenger when he observed rival gang members and began yelling at them. Then, one of the rival gang members shot at defendant's car, striking defendant's girlfriend. The State also presented victim impact statements from Alyna, Emily, and Michael's mother. In mitigation, defense counsel stated that defendant was supported by his family and he had no significant criminal background. The presentence investigation report was also submitted to the court.

¶ 15    The trial court ultimately sentenced defendant to 40 years' imprisonment for first degree murder, a consecutive 10 years' imprisonment for aggravated battery, and a concurrent 6 years' imprisonment for aggravated discharge of a firearm, for an aggregate total of 50 years' imprisonment. In so sentencing, the court made the following relevant statements:

> "The Illinois legislature, in their wisdom, has taken much discretion away from judges in matters like this. There are mandatory minimum sentences. Sentences for first-degree murder must be at 100 percent. It has come to the point that many, if not all of these first-degree murder sentences, since we've had our truth in sentencing and gun enhancement legislation, they're amounting to life sentences or close to life sentences for everybody. I am mindful of that.

And I am mindful that the law in Illinois also indicates that for the aggravated battery count, the shooting of Emily Guerrero, that this has to run consecutive. And I'm mindful that [defendant] is not the shooter in this case; he was the driver.

But what has he done? He's a very young man and he has decided to live the life of a thug. He's tattooed himself with gang tattoos all over the place, and he's living the thug life. I saw clearly on the videotapes the way he comported himself when the detectives weren't in the room and he was talking to other people. I am questioning whether there is any potential to rehabilitate this young man. I think he is just one of these people that's out there that's chosen to be different than everybody else. I don't know that he can change himself even if he could. I don't know that he wants to.

We talk frequently about people that have to be sentenced here, that they grow up in difficult neighborhoods that are gang infested. Frankly, [defendant] is one of the problems. He's one of the people that causes terror and havoc for everybody else in the community. It's people like him that make Chicago living as difficult as it may be from time to time. It's because he's a predator.

This is just outright urban terrorism. I cannot fathom anything else but to go purposely driving from one location into another where you know that people affiliated with some different street gang might be there, looking for people to shoot. And what happened in this case is just beyond words.

\*\*\*

I don't know that even with minimum sentences that people are going to survive this sentence. If [defendant] survives this sentence. If [defendant] survives this sentence,

I'm not sure how many people in this room will still be alive if he can live through this sentence because we're talking about time at 100 percent.

I've listened to everything in aggravation and mitigation. I will sentence him accordingly. And I'm mindful of the fact that [his codefendant], the shooter in this case, got a sentence that was a minimum sentence for him. [Defendant] was the driver. But I find that [defendant] is wholly culpable, and this would not have happened but for him."

¶ 16    Defendant filed a motion to reconsider his sentence, arguing that the sentence was excessive in light of defendant's participation in the offense, the court considered matters that were implicit in the offense, the sentence was disparate as compared to his codefendant's sentence, and the court penalized defendant for exercising his right to trial. The trial court denied the motion.

¶ 17    A direct appeal followed, wherein defendant argued that there was insufficient evidence to support his aggravated battery conviction, his 50-year sentence was unconstitutionally disparate to his codefendant, and his sentence violated the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution.

¶ 18    On September 26, 2018, this court issued an order, affirming defendant's convictions. *People v. Garza*, 2018 IL App (1st) 115324-U, ¶ 1. Specifically, the court concluded that the State presented sufficient evidence and the trial court did not abuse its discretion in sentencing defendant to an aggregate sentence of 50 years. *Id.* We also found that defendant had forfeited his as-applied challenge to the constitutionality of his sentence under the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution. *Id.* ¶¶ 39-41. On February 10, 2019, the Illinois Supreme Court denied leave to appeal. See 2019 IL 124145.

¶ 19    On September 19, 2019, defendant filed his initial *pro se* postconviction petition that is the subject of this appeal, arguing that his 50-year sentence was a *de facto* life sentence that violated

the proportionate penalties clause of the Illinois Constitution and was unconstitutional as applied to him. The petition included defendant's affidavit, repeating the allegations contained in the petition.

¶ 20    On October 15, 2019, the court summarily dismissed defendant's petition, stating in its order that it was "outside the parameters" of *People v. Buffer,* 2019 IL 122327.

¶ 21    This appeal followed.

¶ 22                                      II. ANALYSIS

¶ 23    Defendant contends that his 50-year aggregate sentence is a *de facto* life sentence that violates the proportionate penalties clause of the Illinois Constitution and was unconstitutional as applied to him. The State argues that the trial court properly dismissed the petition because it had no arguable basis in fact or law as defendant's sentence was not mandatory and he offered no factual support for the claim that he is like a juvenile offender.

¶ 24    We briefly note that on direct appeal this court found that defendant's arguments regarding the constitutionality of his sentence, akin to those included in the instant petition, were forfeited because they were not raised in the trial court and because the supreme court in *People v. Thompson*, had determined that an as-applied constitutional challenge, such as the one raised by defendant on direct appeal, is best suited to resolution in the trial court to permit the record to be developed. *Garza*, 2018 IL App (1st) 1152324-U, ¶¶ 39-41. Defendant now raises those claims in the instant postconviction proceeding, as is appropriate.

¶ 25                               A. Standard of Review

¶ 26    The Act provides a method for a defendant to collaterally attack a conviction by asserting that it resulted from a "substantial denial" of his constitutional rights. 725 ILCS 5/1221 (West 2018); *People v. Hodges*, 234 Ill. 2d 1, 9 (2009). A postconviction proceeding in a noncapital case

has three stages. *Hodges*, 234 Ill. 2d at 10. At the first stage, a trial court may summarily dismiss a postconviction petition within 90 days if it "determines the petition is frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2018).

¶ 27    In the first stage, as we have here, a petition is frivolous or patently without merit when it "has no arguable basis in either fact or law." *Hodges*, 234 Ill. 2d at 11-12. A petition has no arguable basis in law or fact where it is "based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* at 16. Additionally, a defendant's claim is considered frivolous or patently without merit if it is procedurally barred under either *res judicata* or forfeiture. *People v. Blair*, 215 Ill. 2d 427, 445 (2005). The trial court may summarily dismiss a petition if the defendant fails to "either attach the necessary 'affidavits, record or other evidence,' or explain their absence" (*People v. Collins*, 202 Ill. 2d 59, 66 (2002)), or if the petition simply alleges "nonfactual and nonspecific assertions that merely amount to conclusions" (*People v. Morris*, 236 Ill. 2d 345, 354 (2010)). While a defendant's petition is to be liberally construed and need only present a limited amount of detail, that "does not mean that a *pro se* [defendant] is excused from providing any factual detail at all surrounding the alleged constitutional deprivation." *People v. Delton*, 227 Ill. 2d 247, 254 (2008). We review *de novo* the summary dismissal of a defendant's postconviction petition. *People v. Allen*, 2015 IL 113135, ¶ 19.

¶ 28                    B. Proportionate Penalties Clause

¶ 29    Prior to proceeding with our analysis, we briefly discuss the context for defendant's proportionate penalties clause claim. Defendant's as-applied constitutional challenge is premised on a line of cases providing heightened protections for juvenile defendants in sentencing under the eighth amendment of the United States Constitution, which prohibits cruel and unusual punishment. See *Roper v. Simmons*, 543 U.S. 551, 574-75 (2005) (eighth amendment prohibits the

death penalty for juveniles who commit murder); *Graham v. Florida*, 560 U.S. 48, 82 (2010) (eighth amendment prohibits mandatory life without parole sentences for juveniles who commit nonhomicide offense); *Miller v. Alabama*, 567 U.S. 460, 479 (2012) (eighth amendment prohibits mandatory life without parole sentences for juvenile offenders convicted of homicide). Specifically, the rationale for the holding in *Miller*, the preeminent case, was that "children are constitutionally different from adults for purposes of sentencing," as they are less mature, responsible, more impulsive and more vulnerable to peer pressure than adults. 567 U.S. at 471-74.

¶ 30    The Illinois Supreme Court has seen fit to expand the *Miller* protections to juvenile offenders who receive *de facto* life sentences (*People v. Reyes*, 2016 IL 119271, ¶ 9) and has determined that a prison term of 40 years or more for a juvenile offender is a *de facto* life sentence (*People v. Buffer*, 2019 IL 122327, ¶ 40). Protections under *Miller* were once again extended in *People v. Holman*, 2017 IL 120655, ¶ 40, wherein the court held that "[l]ife sentences, whether mandatory or discretionary, for juvenile defendants are disproportionate and violate the eighth amendment, unless the trial court considers youth and its attendant characteristics." The court further held that a juvenile may only be sentenced to life imprisonment without parole if the trial court first determines that the juvenile defendant's conduct demonstrated "irretrievable depravity, permanent incorrigibility, or irreparable corruption." *Id.* ¶ 46.[1] Such a determination should be made after the trial court has considered the *Miller* factors, which include, but are not limited to:

---

[1] We are aware that the United States Supreme Court has recently issued its decision in *Jones v. Mississippi*, 141 S. Ct. 1307, 1318-19 (2021), in which *Miller* and *Montgomery* were once again invoked and the Court held that sentencing courts are not constitutionally mandated under the eighth amendment to make a finding of "permanent incorrigibility" before sentencing a juvenile defendant to life without parole. Nonetheless, the Court also expressly stated that states are not precluded from imposing any sentencing mechanisms they see fit in cases involving juvenile defendants convicted of murder, such as requiring extra factual findings, prohibiting sentences of life without parole for juveniles, or permitting appellate review based in proportionality for life-without-parole sentences. *Id.* at 1323. As of yet, our

"(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Id.* (citing *Miller*, 567 U.S. at 477-78).

¶ 31    In his petition, defendant does not claim that his sentence is unconstitutional under the eighth amendment. Clearly, such a claim would be met with rejection as defendant was not a juvenile at the time he committed the offense. See *People v. Franklin*, 2020 IL App (1st) 171628, ¶ 49 ("It is well established that offenders who are 18 years and older cannot raise a facial challenge to their sentences under the eighth amendment and the *Miller* line of cases."). He instead alleges that his sentence, which he characterizes as a *de facto* life sentence, violates the proportionate penalties clause of the Illinois constitution.

¶ 32    The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill Const. 1970 art. I, § 11. This clause provides greater protections against excessive punishment than the eighth amendment. *People v. Fernandez*, 2014 IL App (1st) 120508, ¶ 63; *People v. Minniefield*, 2020 IL App (1st) 170541, ¶ 35. A defendant's sentence violates this clause if "the punishment for the offense is cruel, degrading, or so wholly disproportionate to the offense

---

supreme court has not indicated any deviation from its position in *Holman*, and unless and until such direction is given in light of *Jones*, we are constrained to follow it.

as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). The proportionate penalties clause requires balancing the goals of retribution and rehabilitation, which necessitates a careful consideration of all the factors in aggravation and mitigation. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). We may determine whether a sentence shocks the moral sense of the community by considering both objective evidence and the community's changing standard of moral decency. *People v. Hernandez*, 382 Ill. App. 3d 726, 727 (2008).

¶ 33    Recently, there has been a trend in the legislature to effectively treat young adults aged 18 to 21 years old as juveniles and shift the line of demarcation for adults to 21 years old in certain situations. Section 5-4.5-115(b) of the Code provides for parole review, "after serving 20 years or more" of a sentence, for defendants who were under the age of 21 when they committed first degree murder. See Pub. Act 100-1182 (eff. June 1, 2019) (adding 730 ILCS 5/5-4.5-110); Pub. Act 101-288 (eff. Jan. 1, 2020) (renumbering 730 ILCS 5/5-4.5-110 to 730 ILCS 5/5-4.5-115). Further, "[i]n considering the factors affecting the release determination ***, the Prisoner Review Board panel shall consider the diminished culpability of youthful offenders, the hallmark features of youth, and any subsequent growth and maturity of the youthful offender during incarceration." Pub. Act 101-288 (eff. Jan. 1, 2020) (renumbering 730 ILCS 5/5-4.5-110(j) to 730 ILCS 5/5-4.5-115(j)). Language in the public act echoes the considerations pronounced by the court in *Miller* that trial courts should utilize in sentencing juvenile offenders. These recent legislative developments evidence a shift in the treatment of youth who encounter the criminal justice system. The emerging caselaw which now permits a youthful defendant, through an as-applied constitutional challenge, to develop the record and to demonstrate whether he was the functional equivalent of a juvenile at the time of the offenses, aligns with the legislative trend.

¶ 34    In two cases on direct appeal, our supreme court has recognized that young adults (those between 18 and 21 years old) may rely on the evolving neuroscience regarding brain development in juveniles and its correlation to maturity underpinning the *Miller* decision in support of an as-applied challenge pursuant to the proportionate penalties clause of the Illinois Constitution. See *Thompson*, 2015 IL 118151, ¶¶ 43-44; *Harris*, 2018 IL 121932, ¶ 48. In *Thompson* and *Harris*, the court opened the door for young defendants to demonstrate that their own specific characteristics and circumstances were so like those of a juvenile that imposition of a life sentence, absent the necessary considerations established in *Miller,* would violate the proportionate penalties clause. The court instructed, however, that such claims would best be pursued through a postconviction proceedings. *Thompson*, 2015 IL 118151, ¶¶ 43-44 (noting that a 19-year-old defendant was "not necessarily foreclosed" from asserting such a claim in postconviction proceedings); *Harris*, 2018 IL 121932, ¶ 48 (holding that the as-applied, youth-based sentencing claim of an 18-year-old defendant was "more appropriately raised" in postconviction proceedings). Defendant has done so here and now seeks review in a postconviction proceeding.

¶ 35    In deciding *Thompson* and *Harris*, our supreme court has forged a clear path for review of youth based sentencing claims. Less clear is the modicum and quality of evidence necessary in a postconviction petition to pass first stage muster for such claims. We do not read either case to mandate summary remand by mere virtue of the fact that one may fall within the classification of a youthful offender. If that were the case, appellate review would not only be meaningless but wholly unnecessary. Nevertheless, we are mindful that here we are confronted with defendant's initial postconviction petition, which requires for its viability that petitioner state merely the gist of a constitutional claim.

¶ 36     It has long since been settled that, at this stage, the postconviction petitioner is not expected and need not make legal arguments or cite to legal authority. *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996). And, although the petition need only present a limited amount of detail, the petitioner must set forth the specific manner in which his rights were violated. *People v. Porter*, 122 Ill. 2d 64, 74 (1988). Thus, at the end of the day, it remains a requirement that to survive summary dismissal, the petition must allege something more than nonfactual and nonspecific assertions to support its claims. See *Morris*, 236 Ill. 2d at 354. We believe that defendant has sufficiently met the threshold burden at this first stage postconviction proceeding, and we recite the allegations contained in *pro se* petition in detail below.

¶ 37     Defendant first sets forth in detail the testimony of Dr. Laurence Steinberg and Dr. Erin David Bigler and the scientific studies that have been conducted regarding the psychological immaturity of individuals in their late teens and early twenties. According to the petition, both doctors have opined that the same arguments made for juveniles in *Roper* and *Miller* could be applied to young adults. Defendant states that due to his incarceration and indigent status, he was unable to obtain affidavits from Dr. Steinberg and Dr. Bigler, who he would like to call as witnesses to testify on his behalf. He then discusses his particular circumstances, noting in particular that at the time of the shooting he was 19 years of age and that he was convicted on a theory of accountability. His criminal history consisted of a misdemeanor domestic violence and escape from electronic monitoring convictions. He also set forth his personal background, including his learning disability, his difficult upbringing, and his introduction to gangs, specifically, the Latin Saints. He noted in particular that his father was not a part of his life and that his mother did not have a job, which resulted in him moving from house to house throughout his childhood. He left school during the ninth grade, fell under the influence of the Latin Saints,

began selling drugs, and became a father at the age of 16. He concludes his petition by asserting that his difficult childhood, the influence of gangs, and peer pressure as relevant to his age, should be weighed in determining his sentence. Attached to his petition is also an affidavit attesting to his upbringing and affiliation with gangs as laid out in the petition.

¶ 38    Defendant claims that at the time of the offense his circumstances and characteristics made him more like a juvenile offender. Specifically, he refers to the influence of the gang and its accompanying peer pressure. Defendant also suggests that his housing instability, his issues at school, and his need to provide for his family made him more susceptible to falling under the influence of the gang. He claims that his upbringing and the influence of the gang was not expressly considered by the court in concert with his young age. Defendant's petition makes specific factual assertions in combination with the research on young adult's brain development and goes on to state that the trial court failed to consider his specific facts and circumstances at sentencing.

¶ 39    As a component of our review, we have carefully reviewed the substance of defendant's original sentencing hearing to determine whether any aspects of the proceeding can be read to comport with the *Miller* requirements. In so doing, we recognize that the law on sentencing challenges involving young adults continues to evolve, as is apparent from the supreme court's directive to this court to reevaluate the decision in *People v. House*, 2015 IL App (1st) 110580, in light of *People v. Harris*, 2018 IL 121932, and now the court's recent grant of the petition for leave to appeal in the revisited *House* decision (2020 IL 125124). Further, unlike the sentencing judge in this case, we have the benefit of hindsight. That said, after reviewing defendant's petition, in light of the relevant caselaw and the unique facts of this case, we believe that this is precisely the type of case that lends itself to further proceedings under the Act.

¶ 40    We note, as we did on direct appeal, that defendant's sentence was within the applicable statutory ranges for the offenses, where first degree murder has a sentencing range of 35 to 75 years (730 ILCS 5/5-4.5-20 (West 2012); 730 ILCS 5/5-8-1(a)(d)(I) (West 2012)), aggravated battery has a sentencing range of 6 to 30 years (720 ILCS 5/12-3.05(e)(1) (West 2012); 730 ILCS 5/5-4.5-25 (West 2012)), and aggravated discharge of a firearm has a sentencing range of 4 to 15 years (720 ILCS 5/24-1.2(a)(2) (West 2012)). In pronouncing sentence, the court noted defendant's young age and his role in the shooting as the driver. However, the court did not expressly address the *Miller* factors and made no findings either regarding permanent incorrigibility or defendant's rehabilitative potential. Neither did the court consider defendant's level of immaturity or impulsivity based on his youth and his upbringing or the effect of peer pressure and the influence of a gang on a young person. Rather, the court largely focused on the seriousness of the offense, referring to defendant as a "predator" carrying out "urban terrorism. Based on our review, we conclude that the court did not give any particularized consideration to defendant's youth and its attendant characteristics, such that defendant's claim that he was the functional equivalent to a juvenile could alter the result if he is ultimately granted a new sentencing hearing.

¶ 41    The State entreats us to follow *People v. Rivera*, 2020 IL App (1st) 171430. However, *Rivera* is not only factually inapposite but is also at a different stage procedurally. There, this court analyzed a claim made in a successive postconviction petition, which is treated differently than an initial *pro se* postconviction petition. *Id.* ¶ 10. Additionally, the defendant in *Rivera* was 23 years old, had two prior felony convictions, and had been involved in a carefully planned armed robbery. *Id.* ¶¶ 5-6. Thus, we are unable to draw any relevant parallels between *Rivera* and the case at bar.

¶ 42    Rather, the factual circumstances in this case have much in common with those in *People v. House*, 2019 IL App (1st) 110580-B, which we again note is currently pending before the supreme court (2020 IL 125124). In *House*, the defendant, who was 19 years old at the time of the offenses, was convicted of two counts of first degree murder and two counts of aggravated kidnapping and sentenced to two consecutive life sentences and two consecutive terms of 30 years. *Id.* ¶ 4. He was convicted solely under an accountability theory. *Id.* ¶ 29. The defendant acted as the lookout but was also armed. *Id.* ¶¶ 7, 15. Much of the *House* court's reasoning in finding the sentence violated the proportionate penalties clause was based on the defendant's lesser culpability in the crimes, along with the trial court's inability to consider certain factors in mitigation, specifically the defendant's potential for rehabilitation. *Id.* ¶¶ 46, 63-64.

¶ 43    Similarly, here, defendant was the driver and did not actually shoot either Michael or Emily. He was solely convicted on a theory of accountability. There was no evidence presented that defendant knew Javier was going to shoot someone and no evidence that this shooting was planned in any way. A chief difference, however, between *House* and the case before us is that the trial court in *House* did not have discretion to consider factors in both aggravation and mitigation, whereas the trial court here did. But see *People v. Holman*, 2017 IL 120655, ¶ 40 (holding that a *de facto* life sentence, whether mandatory or discretionary, may violate the constitution if a defendant's youth and its attendant characteristics are not considered).

¶ 44    Nevertheless, the trial court did not explicitly address the *Miller* factors, and we cannot say whether defendant might have received a lesser sentence had the court done so. Defendant's age at the time of the offense, the particular circumstances of the offense, and the substance of the sentencing hearing suggest that a more developed record regarding the application of the evolving neuroscience on brain development to defendant's specific facts and circumstances is warranted.

¶ 45 Although the State's arguments on appeal lack merit, before concluding, we are nonetheless compelled to note them and to also state the basis for our rejection of the same. The State asserts that the "record shows that although not expressly articulated, the trial court considered Petitioner's youth and associated characteristics of youth." It boldly asserts that defendant's claims are "positively rebutted by the record." We are troubled by the State's less than candid representation of the record. The State's assertions regarding the sentencing judge's findings are clearly and absolutely belied by the record.

¶ 46 The State additionally argues that because the trial court was "apprised" of many of the relevant factors under *Miller*, there is no violation and the trial court complied with *Miller*. The record before this court reveals that the trial court mentioned that defendant was a "very young man." That was the extent of the court's reference to defendant's youth and its attendant characteristics. Further, although the court made a passing comment regarding defendant's rehabilitation potential, it made no finding. From our reading of the trial court's oral ruling at sentencing, the transcript of which appears in the record, there is absolutely no basis to conclude that it considered whether defendant's actions were a reflection of his youth, his upbringing, peer pressure, or the result of an immature and undeveloped brain equivalent to that of a juvenile.

¶ 47 We additionally note the State's overstatement of defendant's involvement in the offense. According to the State, defendant was "no less instrumental in the victim's death" and his crimes "were planned and calculated." We again point out that defendant was convicted on a theory of accountability. Evidence in the record is that defendant's only involvement was that he was driving the van, he was affiliated with the same gang as Javier, and he fled from police. We do not know whether defendant conspired with his codefendant or whether he had knowledge of codefendant's

plans at the time of the shooting—there is simply no evidence of either. We find the State's characterization of the evidence to be based merely, and inappropriately, on conjecture.

¶ 48    Finally, the State urges that "[I]n order to overcome the presumption of constitutionality of a discretionary life sentence, the adult defendant must prove that his particular circumstances and brain development proves that, at the time of the offense, he was functionally equivalent to a juvenile ***; and (2) application of the *Miller* factors to his specific circumstances establish that his youth and attendant circumstances reflect transient immaturity and not incorrigibility." We do not disagree. However, we are not yet at a stage in the postconviction proceedings in which the defendant is required to present his proofs.

¶ 49     Here, at the first stage, we are asked, only, whether, based on the allegations in the petition, which we accept as true, and the record before us, summary dismissal of the petition was proper. Given the particulars of the offense and defendant's background, coupled with his youth at the time of the offense, we believe that it was not. Accordingly, because we find, that defendant has set forth the gist of claim that his sentence violated the proportionate penalties clause, we must reverse the trial court's summary dismissal of the *pro se* petition and we remand for second stage proceedings under the Act.

¶ 50                                III. CONCLUSION

¶ 51    For the reasons stated, we reverse the judgment of the circuit court and remand for further proceedings.

¶ 52    Reversed and remanded.