2022 IL App (1st) 192305-U

No. 1-19-2305

Order filed October 21, 2022

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 15 CR 6 |
| | ) | |
| MARQUELLE PALMER, | ) | Honorable |
| | ) | Stanley J. Sacks, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE DELORT delivered the judgment of the court.
Presiding Justice Connors and Justice Cunningham concurred in the judgment.

**ORDER**

¶ 1    *Held:* We affirm defendant's conviction for first degree murder and reject his contention that the evidence was insufficient to prove him guilty beyond a reasonable doubt.

¶ 2    After a jury trial, defendant Marquelle Palmer was found guilty of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and sentenced to 50 years in prison. On appeal, he contends the State failed to prove him guilty beyond a reasonable doubt because no direct evidence tied him to the murder. We affirm.

¶ 3                                      BACKGROUND

¶ 4       The State charged defendant with six counts of first degree murder for shooting and killing

the victim, Melissa Woods. It nol-prossed four counts and proceeded to trial on two counts.  The

first count alleged that defendant, without lawful justification, intentionally or knowingly shot and

killed Woods while armed with a firearm. The second count alleged that defendant shot and killed

Woods while armed with a firearm knowing that such act created a strong probability of death or

great bodily harm to her.

¶ 5       Because defendant argues on appeal that he was convicted based on circumstantial

evidence which was insufficient to prove him guilty beyond a reasonable doubt, we must recite

and examine the evidence in detail. At trial, Debra Davis, Woods's sister, testified she last talked

to Woods by telephone on May 15, 2012. The following day, Woods's phone was dead, and Davis

was unable to contact her. She stated that Woods had an "8-ball" tattoo.

¶ 6       Chicago Police Officer Anthony Ceja testified that, on May 28, 2012, he and his partner

responded to a report that a person had been shot near the 1500 block of South Sawyer Avenue.

While searching that block for a suspect, the officers entered an abandoned building with boarded-

up windows and plywood removed from the rear basement door. When Ceja entered the abandoned

building, he smelled a "strong odor" and, in the basement, found a dead body of a woman with an

8-ball tattoo on her lower back.

¶ 7       Chicago police department forensic investigator Victor Rivera testified that, on May 28,

2012, he spoke with officers at the abandoned building, performed a walk-through, and videotaped

and photographed the scene. Rivera recovered evidence from the scene, including a chain, a

condom wrapper, an empty candy wrapper, a .357 cartridge, and an orange jacket.

¶ 8      Dr. Ponni Arunkumar, the Cook County chief medical examiner, testified that on May 29, 2012, she performed an autopsy on the woman with an 8-ball tattoo. The body had three gunshot wounds (two in her right, lower chest, and one in her left arm) and was in a state of advanced decomposition.  Dr. Arunkumar opined that the cause of death was multiple gunshot wounds, and the manner of death was homicide. She could not provide a precise date of death. Dr. Arunkumar subsequently learned the woman was identified as Woods.

¶ 9      Kimberly McCracken testified that she had two prior felony convictions, one for "narcotics" and the other for forgery. McCracken acknowledged she was testifying under subpoena, and that the State's Attorney's office paid for her travel expenses. McCracken admitted she had been a drug addict and abused cocaine and alcohol for "a couple of decades" but had been sober since her incarceration in 2012.

¶ 10     McCracken testified that she met Woods in the 1990s, and they would "get high" together. McCracken met defendant, whom she identified in court, in 2011, and he provided her with drugs. Defendant also went by the nicknames "Q" and "T."

¶ 11     On May 10, 2012, McCracken met with Woods at a "flop house." They later left to meet with defendant, who came to deliver drugs to them. Defendant picked them up in a red Camaro with another man, and they eventually found a room in a hotel in Bloomington, Illinois. At the hotel, McCracken and Woods drank alcohol and smoked marijuana and cocaine. The four stayed at the hotel overnight, and defendant and the other man left the following morning. Defendant returned to the hotel about an hour later in a white Buick.

¶ 12     Defendant, McCracken, and Woods decided to go to Chicago to "cop some drugs and come back." When the "connect wasn't ready," they ended up staying in Chicago. Woods and McCracken purchased clothes as they had no "underwear and stuff" and "it was, like, 100 degrees

outside." The three then went to the Grand Motel. When McCracken asked how Woods was getting free drugs, Woods answered that "she was trying to miss a court date" for defendant's twin brother and "she had to testify against some people and that she didn't want to." Woods planned to stay in Chicago until after the court date because she did not want to attend and believed the police were looking for her in Bloomington. Woods said that defendant would "take care of everything" until she got back, which McCracken understood to mean that defendant would ensure Woods had food, clothes, and narcotics. Defendant had offered McCracken $500 to stay with Woods in Chicago, but he never paid her.

¶ 13    At the hotel, McCracken and Woods consumed alcohol, marijuana, and cocaine. McCracken's friend Terrell Perkins then joined her and stayed with her in a separate hotel room from defendant and Woods. The following morning, Perkins left, and McCracken, Woods, and defendant checked out of the hotel and went to defendant's mother's house, near East 107th Street and Wabash Avenue. The three stayed in the basement of the house, where they were drinking and smoking. That night, Woods, defendant, and McCracken met Perkins at a liquor store near Loyola University. They also went to a beach near Navy Pier, dropped Perkins off, and then returned to defendant's mother's house.

¶ 14    The following morning, May 13, 2012, defendant said that they were having car problems. McCracken called "everybody" to inform them they would not return to Bloomington that day. McCracken and Woods remained in the basement of defendant's mother's house for most of the day until McCracken called her ex-sister-in-law, Janiene Wallace, because she "wanted somebody to know where and who [she] was with while [she] was up there." Wallace came to the house and McCracken spoke with her outside for 15 to 20 minutes before returning to the basement.

¶ 15    The next morning on May 14, 2012, defendant informed Woods and McCracken that he was returning to Bloomington but said that they should stay at his mother's house. McCracken insisted they stay at Wallace's home, which "irritated" defendant, but he dropped them off there. McCracken did not speak with defendant until that night, when he called to tell her it was too late for him to return to Chicago.  Defendant wired McCracken $100 for clothes, food, beer, and drugs.

¶ 16    Defendant called McCracken at around 1 a.m. on May 16, 2012, informing her that he was returning to Chicago and to "get up and get ready." Defendant arrived at Wallace's house at around 3 a.m. that morning. Once outside, he called McCracken and asked her to come outside without Woods. McCracken got inside defendant's white Buick and noticed he was "pissed" and "angry."

¶ 17    Defendant drove away and told McCracken that "[Woods] was talking to the police in his mother's house, and then he said he was going to kill the b***. That's exactly what he said. He said, I'm probably going to wind up throwing her ass in the water." Defendant drove to a south side pier where he told McCracken that Woods still was agreeing to testify against his brother, despite staying at his mother's house and accepting drugs from him. Defendant also "said that the lawyer had told him that he talked to [Woods] and she said she was out of town and having car trouble but that to continue it and then she would show up to the next court date."

¶ 18    Defendant told McCracken that Woods "wasn't coming back to Bloomington," and that he wanted "to kill the b*** and throw her in the lake." Defendant told McCracken that he was going to put her "on the train," and instructed her to tell people that she had been in St. Louis, not Chicago. McCracken was afraid after defendant's statements but drove with defendant back to Wallace's house.

¶ 19    Once at the house, defendant "called in" and told Wallace to tell Woods to come outside. In the vehicle, defendant confronted Woods about speaking with the police while they were at his

mother's house. Woods thought defendant's statement was "funny," denied speaking with the police, and "tossed" her phone to the front seat of the vehicle. Defendant drove to Union Station, and McCracken spoke to a security guard outside while defendant and Woods remained in the vehicle.

¶ 20    Eventually, defendant called McCracken back to the vehicle and told her that he and Woods were going to a party in the basement at his uncle's house and would later return to Bloomington. McCracken declined to go with them and stayed at Union Station. She told the security guard that she was "riding up here with some people, and I don't feel comfortable with this situation." The guard waited with her until her 7 a.m. train to Bloomington left. The train arrived in Bloomington at 9:14 a.m. McCracken attempted to call Woods twice on May 16, 2012, and again on May 19, 2012, but Woods did not answer her phone.

¶ 21    McCracken testified that, approximately one week later, she saw defendant in Bloomington, and defendant "was just asking me had I been talking to anybody because everybody was looking for [Woods] in town." McCracken confirmed that she told people she had been in St. Louis. Several weeks later, McCracken again spoke with defendant, who stated that someone told him she had been speaking to a detective and a missing person's report had been filed for Woods. McCracken had been speaking to police but denied that to defendant. McCracken subsequently told defendant she had been speaking to Woods's sister, and defendant replied, "[Y]ou don't got to worry about her coming back here no more, she probably dead in a lake somewhere." When defendant made that comment, McCracken "knew [Woods] wasn't coming back up there." Until that point, McCracken had hoped that Woods had been staying in defendant's uncle's basement.

¶ 22    McCracken spoke with Chicago Police Department detectives on several occasions. She was not completely honest during the first interview because she was afraid and did not want to be

involved. She had "sobered up" by the second time she spoke with detectives. When detectives asked McCracken about defendant's statement that he would have to kill Woods, McCracken elaborated that defendant stated, " 'What I'm supposed to do, just let my brother set up and do 20 years.' "

¶ 23    On cross-examination, McCracken stated she met with a detective on June 4 and agreed to have the conversation audio recorded. During that conversation, McCracken told the detective that she and Woods stayed up all night partying at the Red Roof Inn with "a dark-skinned guy" and a "light-skinned guy" and Woods had money to party. McCracken did not bring up defendant's name during that conversation nor did she say he threatened Woods.

¶ 24    Perkins testified that McCracken was a friend and that she called him on May 11, 2012. He spent that night with her at a hotel on the south side of Chicago, left the following morning, and then met with her that night in Rogers Park. McCracken and two individuals he had never met before—a "white lady" and a "black dude"—picked him up that night. Perkins was unsure if the driver was in the courtroom and could not identify a photograph of Woods because the events took place "a long time ago" in 2012.

¶ 25    The group drove to a liquor store in Rogers Park and then to Montrose Park, where Perkins spoke with the man, who "was saying something about a missed -- missing court or something like that[.]" They subsequently took Perkins home. Although Perkins spoke with McCracken over the phone afterward, he believed it was "about linking, getting back together or something."

¶ 26    Perkins did not recall giving a handwritten statement on August 28, 2012, but "guess[ed] [he] made it." Perkins met with Assistant State's Attorney (ASA) Jackie Kwilos on September 20, 2012, and later testified before the grand jury. He did not remember identifying "Q" and Woods in photographs before the grand jury, although he acknowledged his signature appeared on them.

Perkins testified before the grand jury that Q had told him they were in Chicago to miss a court date for his brother. Perkins had a prior conviction for possession of a controlled substance and acknowledged that the State's Attorney paid for his hotel room.

¶ 27    ASA Jacqueline Griffin (*neé* Kwilos) testified that, in August 2012, she interviewed and took a statement from Perkins, which she identified in court. During the interview, Perkins told ASA Griffin that he got picked up around 10 p.m. and had never seen the black man or white woman prior to that night. Perkins learned the driver was Q and the white girl was Woods. Perkins had identified photographs of both Q and Woods. ASA Griffin presented Perkins as a witness before the grand jury in September 2012, and Perkins identified pictures of Woods and Q during his testimony. Perkins had testified before the grand jury that Q told him they were in Chicago to miss a Bloomington court date for his brother. Perkins also admitted that he gave a voluntary written statement in July 2012.

¶ 28    Kenyatta Washington testified that he lived with Wallace in May 2012. On May 13, 2012, Washington was with Wallace when she received a phone call from McCracken, whom Washington had known since the 1990s. Later, Washington drove to pick up McCracken. She sat in the backseat with Wallace, and they spoke for 10 minutes before McCracken exited the vehicle. He had not seen McCracken since that day.

¶ 29    Wallace testified that she lived on the 6700 block of South Green Street in Chicago in May 2012 and had been McCraken's friend for more than 20 years. Her testimony regarding events on May 13, 2012, largely mirrored Washington's and McCracken's testimony. Wallace testified McCracken and Woods were driven to her house in a white Buick on that date, and the two women asked to stay overnight at her house. At around 3 a.m. on May 16, 2012, McCracken received a phone call and then went outside where Wallace observed her getting into the same white Buick.

About an hour later, Woods asked if Wallace thought that she had been left there. Wallace looked out of a window and saw the white Buick still outside. She had not looked out the window before then. Wallace then received a phone call and let Woods outside. Wallace saw Woods get into the Buick, and then the Buick drove away. The State's Attorney's office paid for Wallace's travel expenses to attend the trial.

¶ 30 Bloomington police sergeant Todd McClusky testified that he was working as a detective and undercover officer for the narcotics unit in May 2012. He knew Woods, who was a confidential informant for the Bloomington Police Department. At that time, Woods was a witness in a criminal trial in Bloomington against defendant's brother, from whom she had purchased cocaine "as an informant." The trial was set to begin on May 14, 2012, and Woods was supposed to meet with McClusky that morning to prepare her testimony.

¶ 31 McClusky unsuccessfully attempted to contact her, leading him to conclude that it was "obvious she had left town" and "she was being evasive with [him] [about] where she was." Woods told him she went on a trip for the weekend but had been "stranded in the Chicagoland area." Woods told McClusky she intended to return to Bloomington, but "as the day went on, it was apparent *** she was most likely evading [him]." On May 15, 2012, during a hearing in open court, McClusky obtained a no-bond warrant for Woods's arrest because she failed to comply with a subpoena. He "spoke to her throughout the couple days that this was occurring." McClusky did not hear from Woods after May 15, 2012.

¶ 32 Bloomington police detective Jared Roth testified that, in May 2012, he was assigned to investigate Woods's missing person's report filed by Woods's sister, Wendy Woods.[1] Roth spoke with McCracken in a parking lot in Bloomington and recorded the conversation with her

---

[1] Because this witness shares a last name with the victim, we refer to her by her first name.

permission. After that conversation, Roth spoke with Davis and Wendy to review Woods's cell phone records. Roth also obtained Woods's dental records and a court order for McCracken's phone records. Woods's and McCracken's phone records revealed two numbers in common: one with a 217 area code and another with a 309 area code. Roth also contacted the Cook County Medical Examiner's office and learned there was an unidentified body that matched Woods's description. Based on Woods's dental records, the body was then identified as Woods.

¶ 33    On June 25, 2012, Roth informed Chicago police detective Thomas Crain that McCracken had been arrested in connection with an unrelated case. The next day, Chicago police detectives Crain and Raschke interviewed McCracken in Bloomington.[2] The detectives interviewed her again on July 2, 2012.

¶ 34    On cross-examination, Roth testified that McCracken told him that the last time she had seen Woods was on May 15, 2012. During their second conversation, McCracken told Roth that she did not travel to Chicago with Woods, she "just happened" to go to Chicago and found out Woods was there.

¶ 35    Illinois State Police forensic scientist Debra Klebacha testified that she tested oral, vaginal, and anal swabs from Woods's body and concluded that there was no semen present. A test on the vaginal swab for the presence of saliva was inconclusive. Klebacha received fingernail clippings taken from Woods, swabbed them for the presence of cellular material, and forwarded the swab for DNA analysis.

¶ 36    Greg DiDomenic, a supervisor in the Biology DNA Section with the Illinois State Police at the Forensic Science Center in Chicago, testified that he received a swab standard collected from defendant, and a blood standard, a vaginal swab, and fingernail clippings collected from Woods.

---

[2] Chicago police detective Raschke's first name is not contained in the record.

No DNA profiles were available from the vaginal swab or fingernail clippings. DiDomenic also received a used condom, which had only a male DNA profile that did not match defendant's DNA.

¶ 37    Emily Kuppinger, a fingerprint analyst at the Illinois State Police Forensic Science Center, testified that she tested but was unable to find any suitable latent prints for comparison on the following items: two empty candy wrappers, an empty bag of chips, and a .357-magnum cartridge.

¶ 38    Bloomington police officer Stephen Brown testified that, on July 9, 2012, he was surveilling a residence on the 1100 block of Mu Street in Bloomington as a member of the vice unit. Brown observed defendant, whom he identified in court, coming and going from the Mu residence accompanied by James Ferguson.

¶ 39    Normal police sergeant James Ferguson testified that he surveilled the Mu Street residence and observed defendant, whom he identified in court, enter it on several occasions in June and July 2012. A search warrant was executed for the Mu Street residence on August 1, 2012. On December 17, 2012, Ferguson spoke with defendant and his attorney, and defendant gave written consent to search five cellular phones that were recovered from the Mu Street residence during the search.

¶ 40    Federal Bureau of Investigation (FBI) special agent Daniel Getchell testified that, on August 1, 2012, he was part of a team that executed a search warrant at the Mu Street residence. One of the items he recovered was a black LG phone, which he identified in court.

¶ 41    Donald Frugoli, a forensic examiner with the Chicago police department, testified that he examined an LG cell phone and determined that the phone was associated with a telephone number ending in 1434.

¶ 42    Icabela Miller testified that she worked as the records custodian and keeper at US Cellular. She identified a phone record, which showed the "subscriber information" for phone number ending in 4480 that was associated with the name Sam Doe, which was not necessarily a real name,

and an address on the 1500 block of East Empire Street in Bloomington. Miller also identified the records for phone number ending in 1434 that had an associated name of Sam Doe and an address of on the 1700 block of Bradford Lane in Normal, Illinois. Miller clarified US Cellular's default name is Sam Doe when no name was listed.

¶ 43    The parties then stipulated that, if called, Sprint's custodian of records would testify that the cell phone records and cell tower history records from May 10, 2012, through May 16, 2012, for the phone number ending in (1) 0900 were accurate and showed McCracken was the owner and (2) 4773 were accurate and showed Woods was the owner.

¶ 44    FBI special agent Joseph Raschke testified as an expert in the field of historical cell site analysis.[3] He ran historical cell site analysis for telephone numbers ending in 0900 (McCracken), 4773 (Woods), 4480 (defendant), and 1434 (defendant) to determine the approximate location of the cell phones at specific dates and times. Special Agent Raschke emphasized that he could not state whether a phone was at a specific address based on the records. The cell phone records showed which cellular tower a phone utilized when it was in use. When in use, cell phones monitor signals from cellular towers, and, a majority of the time, the signals come from the tower closest to the phone.

¶ 45    Special Agent Raschke testified that the phone associated with McCracken showed she was in Bloomington on May 10 and early on May 11, 2012, and then later that night her phone was used in Chicago. On May 12, 2012, between 4 p.m. and 12 p.m., McCracken's phone used the tower near the 10000 block of South Wabash, and then traveled north that night. On May 13, 2012, until about 2 p.m. on May 14, 2012, the phone was used near the South Wabash location.

---

[3] FBI special agent Joseph Raschke and Chicago police detective Raschke share the same last name but are not related. For purposes of clarity, we refer to Joseph Raschke as Special Agent Raschke.

On May 15, 2012, between 2:44 p.m. and 4:30 p.m., the phone used a tower near the 6700 block of South Green. On May 16, 2012, between 2:45 a.m. and 3 a.m., McCracken's phone was again in the vicinity of the South Green location.

¶ 46    The phone number associated with Woods showed a similar pattern as McCracken's phone. The records for Woods's phone further showed that there was no activity on the phone after 10:14 p.m. on May 15, 2012.

¶ 47    The phone number associated with defendant's phone ending in 4480 registered in Chicago near the South Wabash location on May 12, 2012, between 8 a.m. and 8 p.m. After 9 p.m., the phone registered on the north side of the city, like McCracken's and Woods's phones. On May 14, 2012, between 2:22 p.m. and 2:44 p.m., it registered near the South Green location. On May 15, 2012, between 12:14 a.m. and 12:47 p.m., defendant's phone registered in the "Bloomington-Normal area." On May 16, 2012, between 12:54 a.m. and 2:51 a.m., defendant's phone was back in Chicago. It registered near Union Station between 4:03 a.m. and 4:08 a.m. The second phone number associated with defendant (ending in 1434) showed similar activity as the first phone number. On May 16, 2012, between 8:43 a.m. and 8:44 a.m., defendant's second phone connected to a cellular tower "located right near the body location, [South] Sawyer Avenue location[]."

¶ 48    Chicago police sergeant Thomas Crain testified that, in early June 2012, he investigated the homicide of an unknown female victim. In an attempt to identify the victim, he distributed a flyer with pictures of the victim's tattoos to law enforcement agencies and hospitals. On June 8, 2012, Crain and Chicago police detective Raschke visited the crime scene at the abandoned building on South Sawyer. Later that month, Crain learned the victim had been identified as Woods using her dental records.

¶ 49    On August 1, 2012, Crain and Raschke went to Bloomington, where they met with Roth and interviewed defendant. The interview was recorded, and the State published, without objection, a video of the interview for the jury. This court has reviewed the video footage, which is included in the record on appeal. The footage shows defendant being informed of his *Miranda* rights and agreeing to speak with the officers. Defendant denied knowing Woods. When Crain shows defendant the missing person's flyer, defendant states he has seen the flyer and that his brother sold drugs to Woods. Crain testified that defendant was indicted in December 2014.

¶ 50    On cross-examination, Crain acknowledged that an unfired bullet cartridge was recovered from the abandoned building. He attempted to look for expended firearms evidence, but the basement was "in such disarray" that "it was a waste of time."

¶ 51    The parties stipulated that the female body found by Officer Ceja and his partner in the South Sawyer building on May 28, 2012, was the same body on which Dr. Ponni Arunkumar conducted an autopsy on May 29, 2012. That body was Woods's.

¶ 52    The parties further stipulated that, if called, Chicago police officer Elizabeth Dawson, a forensic evidence technician, would testify that on May 29, 2012, she received biological evidence from Dr. Arunkumar pertaining to a victim, later identified as Woods.

¶ 53    Next, the parties stipulated that a buccal swab was taken from defendant using proper procedure.

¶ 54    The parties further stipulated that Marcus Palmer was defendant's twin brother.[4] On May 14, 2012, Marcus had a pending felony narcotics case in McLean County, Illinois. The case was

---

[4] Because Marcus Palmer shares a last name with defendant, we refer to him by his first name.

set for trial on May 14, 2012. Marcus was in McLean County jail from May 12 through May 16, 2012.

¶ 55    Finally, the parties stipulated to the admission of a certified driving abstract for Melody B. Palmer. The abstract, certified for May 12, 2012, showed Melody's address was on the 10000 block of South Wabash Avenue.

¶ 56    Following the stipulations, the State rested. The court denied defendant's motion for a directed verdict.

¶ 57    The defense began by way of stipulation. The parties stipulated that, if called, Roth would testify that he was assigned to investigate Woods's missing person case, which then became a homicide investigation. In November 2012, Roth testified in McCracken's unrelated cases (case numbers 2012 CF 596, delivery of a controlled substance within a thousand feet of a church; 2012 CF 583, forgery; and 2012 CF 584, forgery) that McCracken was a cooperating witness in Woods's case.

¶ 58    The parties stipulated to the temperature highs for Chicago from May 23 through May 28, 2012, which were 82 degrees, 90 degrees, 83 degrees, 86 degrees, 97 degrees, and 95 degrees, respectively.

¶ 59    Defendant testified that Marcus was his twin brother and was "in some trouble down in [McLean] County" in 2012. Defendant admitted that he had a prior 2013 conviction for conspiracy to deliver cocaine for which he received a 14-year sentence. He acknowledged that he sold drugs and was "the middleman" who introduced people looking to buy and sell drugs. Defendant met McCracken in 2011 and sold her drugs from 2011 to 2012.

¶ 60    Defendant saw McCracken with Woods in Bloomington on May 10, 2012, but did not know Woods at that time. After speaking with them for a few minutes, they went to a hotel to

"[p]arty, smoke, drink, and sell drugs." They stayed at the hotel overnight and checked out the following morning. Defendant had been "informed" that Woods was an informant in his brother's case. That morning, McCracken and Woods decided that they should go to Chicago because they both were scheduled to "testify against two people Friday and the next Monday, and they didn't want to make it to court." McCracken told defendant that she knew someone in Chicago from whom he could purchase drugs. The three of them went to Chicago on May 11, 2012.

¶ 61    Once in Chicago, defendant bought more drugs, and then they went to a hotel where McCracken paid for two rooms. McCracken stayed in one, and defendant and Woods were in the other. McCracken called Perkins, who spent the night with her. The following morning, they went to the West Side to buy more crack. Defendant and the women then went to defendant's mother's house, located at on the 10000 block of South Wabash.

¶ 62    Defendant wanted to purchase drugs from Perkins, so they met him on the north side of Chicago on the night of May 12, 2012. Defendant "bought a couple grams from him" to give to McCracken and Woods. Defendant "[m]ade a deal to buy an ounce from him, 900, and told him that [he] would be back in a day or two to get it." Defendant, McCracken, and Woods stayed at his mother's house that night. He did not force them to stay there.

¶ 63    On May 14, 2012, defendant decided to return to Bloomington to get cash to purchase cocaine from Perkins. While he was away, McCracken and Woods stayed at McCracken's sister's house on Green. Defendant remained in Bloomington on May 15, 2012.

¶ 64    Defendant spoke with McCracken on the evening of May 15, 2012. Early on May 16, 2012, he returned to Chicago to McCracken's sister's house. Defendant thought he would be able to finish his drug transaction with Perkins, but when he arrived, only McCracken came outside. Defendant and McCracken waited in his vehicle for 45 minutes to an hour, but Perkins never

arrived. Eventually, McCracken made a phone call and Woods came outside. Defendant denied driving to the lake or harbor. He drove to Union Station and planned on buying drugs. Defendant had a thousand dollars on him, and he "was going to move around to see if [he] could find somebody to supply them to [him]."

¶ 65    Once at Union Station, McCracken and Woods got out of the vehicle. They spoke outside for a few minutes, and Woods returned to the vehicle. Woods told him she had a friend and "knew where to go party." Woods asked defendant to drop her off because she did not "want to go back to Bloomington with a warrant. She was dope sick and didn't want to be locked up sick." Defendant dropped Woods off at "at a gas station on Homan and Congress by the 290 expressway" so she could "hook up with a friend and party." Defendant saw Woods walk away from the vehicle but did not see anyone waiting for her. Defendant then went to Englewood, the West Side, and "near the hundreds" by his mother's house to find drugs. He was unable to purchase drugs in the amount he wanted and eventually returned to Bloomington on May 16, 2012.

¶ 66    Defendant later saw McCracken in Bloomington but denied threatening her. He further denied telling her that he killed Woods and threw her body in the lake, or that he left Woods to party with his uncle in a basement. Defendant acknowledged learning later that Woods was missing. Between May and August, defendant had been selling drugs. He admitted that he was at the Mu Street residence in Bloomington on August 1, 2012, and was woken up by a police raid and arrested.

¶ 67    Defendant acknowledged speaking with Detective Crain and that he denied knowing Woods. He reasoned that the police "kicked in [his] door" at 4 a.m. for "selling drugs." Although he knew that Woods was a confidential informant, he told police he did not know a confidential

informant. Defendant last saw Woods on May 16, 2012, and she was alive. He denied shooting and killing her.

¶ 68 On cross-examination, defendant admitted that he had more than one cell phone, and he identified one of the phones confiscated from the Mu Street residence as his. He further acknowledged that he had a cell phone number ending in 4480. Defendant was close with his twin brother and visited him while he was incarcerated, where they discussed his brother's narcotics case. Defendant denied that his brother told him that Woods was the confidential informant that led to his arrest, and only described the informant as a "white girl." Defendant did not learn Woods was the informant responsible for his brother's arrest until he met her in Bloomington. When he learned who Woods was, he was not upset.

¶ 69 Defendant provided free drugs to McCracken and Woods and knew they were both addicted to crack cocaine. He denied offering to compensate Woods to miss his brother's trial, but he admitted they discussed her unwillingness to testify against his brother and "Slick," who was McCracken's fiancé. Defendant knew his brother's case was set for trial on May 14, 2012, but did not call to check on its status because he assumed there was a continuance since his brother remained incarcerated. He acknowledged that getting his brother's case dismissed was the purpose for having Woods in Chicago and it "would have been ideal" if the case was dismissed. He denied threatening Woods during his conversation with McCracken in the vehicle after he returned to Chicago from Bloomington.

¶ 70 Following arguments, the jury found defendant guilty of murdering Woods, and the court later sentenced defendant to 50 years in prison on Count I. On October 2, 2019, the court denied defendant's motion to reconsider sentence, and defendant filed a timely notice of appeal.

¶ 71                                      ANALYSIS

¶ 72 On appeal, defendant contends that the State failed to prove him guilty of murder beyond a reasonable doubt. Specifically, defendant argues that there is no direct evidence that he killed Woods and only "extremely thin" circumstantial evidence.

¶ 73 On a challenge to the sufficiency of the evidence, we inquire " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "That standard applies whether the evidence is direct or circumstantial and does not allow this court to substitute its judgment for that of the trier of fact on issues that involve the credibility of the witnesses and the weight of the evidence." *People v. Jones*, 2019 IL App (1st) 170478, ¶ 24.

¶ 74 We draw all reasonable inferences in favor of the State (*Davison*, 233 Ill. 2d at 43) and do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). We will not overturn a criminal conviction "unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Givens*, 237 Ill. 2d 311, 334 (2010).

¶ 75 To prove defendant guilty of first degree murder as charged here, the State had to prove that defendant, without lawful justification, intentionally or knowingly shot and killed Woods while armed with a firearm (720 ILCS 5/9-1(a)(1) (West 2012)).

¶ 76 Although Woods was indisputably shot and killed, defendant contends the evidence failed to prove he was the offender. Specifically, he argues the evidence was insufficient because it was purely circumstantial, there were no eyewitnesses to the murder, the murder weapon was never recovered, he did not give an inculpatory statement, and there was no evidence tying him to the

house where the victim was discovered. We disagree, and find that the evidence was sufficient to prove beyond a reasonable doubt that defendant committed first degree murder.

¶ 77    The evidence was undisputed that defendant knew Woods was a police informant slated to testify in a criminal case against defendant's brother in Bloomington, and his brother's case was set for trial on Monday, May 14, 2012. It was equally undisputed that defendant, Woods, and McCracken arrived in Chicago on May 11, 2012. Defendant admitted the purpose of having Woods in Chicago was to get his brother's case dismissed when Woods did not testify, and he supplied her with free drugs while in Chicago.

¶ 78    Woods remained in Chicago while defendant returned to Bloomington on May 14, the date set for defendant's brother's trial. On May 15, a no-bond warrant was issued for Woods's arrest for failing to comply with a subpoena. Around 3 a.m. on May 16, defendant arrived at Wallace's home where McCracken and Woods were staying. Defendant called McCracken and asked her to come to his vehicle without Woods. McCracken entered defendant's vehicle and noted he appeared "pissed" and "angry."

¶ 79    Defendant told McCracken that, even after accepting free drugs from him and staying in his mother's house, Woods was still agreeing to testify against his brother. Defendant told McCracken that Woods "was talking to the police in his mother's house," "he was going to kill that b***," and Woods "wasn't coming back to Bloomington." Defendant said he was putting McCracken on a train and instructed her to tell people she had been in St. Louis, not Chicago. After Woods joined defendant and McCracken in the vehicle, he confronted Woods about still speaking to the police.

¶ 80    Consistently with the plan defendant communicated to McCracken, defendant then dropped McCracken off at Union Station to take the train to Bloomington. Defendant and Woods

drove away from the train station. No one heard from Woods thereafter. Weeks after the weekend in Chicago, in the context of discussing a missing person's report for Woods, defendant told McCracken that she did not have to worry about Woods "coming back here no more" and Woods was "probably dead in a lake somewhere."

¶ 81    The cell data evidence placed defendant at Union Station between 4:03 a.m. and 4:08 a.m. on May 16, 2012. The historical cell data showed that several hours later, between 8:43 a.m. and 8:44 a.m. on May 16, 2012, defendant was in the area near the abandoned building where Woods's body was later discovered. The exact time of Woods's death could not be determined, because when she was discovered in an abandoned building on May 28, 2012, the high temperatures had caused advanced decomposition of her body. The medical evidence showed that Woods died from multiple gunshot wounds and the manner of her death was homicide.

¶ 82    Given that evidence, a rational trier of fact could reasonably infer that defendant had a motive to kill Woods after he discovered she was still communicating with police about testifying at his brother's trial despite defendant housing her at his mother's home and after supplying her free with drugs. See *Siguenza-Brito*, 235 Ill. 2d at 228 (it is within the province of the trier of fact "to determine the credibility of witnesses, to weigh evidence and draw reasonable inferences therefrom, and to resolve any conflicts in the evidence."). A rational trier of fact could also reasonably infer from defendant's instruction to McCracken to lie about her whereabouts during the weekend in Chicago that defendant wanted to eliminate the connection to Chicago, which was Woods's last known location and where her body was ultimately found. Defendant had threatened to kill Woods, her last known whereabouts were with defendant as they drove away from the station, and defendant was in the vicinity of the abandoned building on the day she disappeared and where her body was eventually discovered. We find the totality of the circumstantial evidence

and the reasonable inferences drawn therefrom, viewed in the light most favorable to the State, established beyond a reasonable doubt that defendant shot and killed Woods and, when he committed those acts, he did so with the intent to kill her. See *People v. Barnes*, 364 Ill. App. 3d 888, 896 (2006) (intent, such as the intent to kill or to cause great bodily harm, is a state of mind that is not usually established by direct evidence but may be inferred from the defendant's conduct and the surrounding circumstances).

¶ 83    Although defendant is correct that there was no forensic evidence tying him to the scene of the crime or an eyewitness to Woods's murder, circumstantial evidence is sufficient to sustain a criminal conviction if the evidence satisfies proof beyond a reasonable doubt of the elements of the crime charged. *People v. Hall*, 194 Ill. 2d 305, 330 (2000). The trier of fact does not need to be satisfied beyond a reasonable doubt as to each link in the chain of circumstances, but rather that all of the evidence taken together satisfies the trier of fact beyond a reasonable doubt of the defendant's guilt. *Id.* As stated, the totality of the circumstantial evidence in this case was sufficient to prove defendant guilty of the first degree murder of Woods beyond a reasonable doubt.

¶ 84    Further, we are unpersuaded by defendant's contentions that he offered a "plausible" explanation that he was in the vicinity of the abandoned building because he was attempting to conduct drug transactions and that McCracken's testimony was unreliable because she was a drug addict. "A trier of fact is not required to disregard the inferences that normally flow from the evidence or to seek out all possible explanations consistent with a defendant's innocence and elevate them to reasonable doubt." *People v. Murphy*, 2017 IL App (1st) 142092, ¶ 11. Further, the trier of fact is free to accept or reject as much or as little as it pleases of a witness's testimony. *People v. Logan*, 352 Ill. App. 3d 73, 80-81 (2004). While defendant's explanation may have been

plausible, the jury was not required to accept his version of events. *Siguenza-Brito*, 235 Ill. 2d at 228.

¶ 85    McCracken's testimony was largely corroborated by the historical cell phone data, which showed defendant's, Woods's, and McCracken's cell phone usage followed her account of their relocation from Bloomington to Chicago and movement around Chicago throughout the relevant time period. The phone data showed the trio in the vicinity of defendant's mother's house on South Wabash, the north side of Chicago where they picked up Perkins, Wallace's house on South Green, and Union Station. Moreover, aside from her statements that defendant threatened Woods, McCracken's testimony was also generally consistent in material respects with defendant's own version of events up until he left her at Union Station. It was the jury's responsibility to assess McCracken's credibility and determine the weight to accord her testimony. *Id.* We will not substitute our judgment for that of the trier of fact on issues involving the credibility of witnesses. *Id.* at 225.

¶ 86                                    CONCLUSION

¶ 87    In sum, we cannot say that "the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Givens*, 237 Ill. 2d at 334. Accordingly, we affirm the judgment of the circuit court of Cook County.

¶ 88    Affirmed.