SIXTH DIVISION
March 24, 2006

No. 1-03-2334

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| | ) | |
| v. | ) | No. 01 CR 31619 |
| | ) | |
| | ) | The Honorable. |
| KEITH BARNES, | ) | Catherine M. |
| | ) | Haberkorn, |
| Defendant-Appellant | ) | Judge Presiding |

PRESIDING JUSTICE McNULTY delivered the opinion of the court:

After a bench trial, defendant Keith Barnes was convicted of attempted murder, two counts of aggravated battery with a firearm, and two counts of unlawful use of a weapon by a felon, all resulting from a November 2001 incident in which he was accused of firing a handgun at a group of five men. Barnes was sentenced to 17 years' imprisonment for the attempted murder conviction, plus concurrent terms of 6 years' imprisonment for each of the aggravated battery counts and 5 years' imprisonment for each of the weapons counts. He appeals, contending that the identification evidence produced at trial was insufficient to prove beyond a reasonable doubt that he was the perpetrator of the crime; that the evidence was insufficient to prove beyond a

reasonable doubt that he intended to kill; that the 17-year sentence for the attempted murder count was an improper increase of his punishment following a motion for resentencing; and that the trial court improperly failed to consider his oral claims of ineffective assistance of counsel. We affirm his convictions and sentences, and remand for further proceedings on Barnes' ineffective assistance claim.

                              FACTS

    Joseph Nevels testified that at approximately 1:30 a.m on November 24, 2001, he was standing with four friends in front of the multi-unit apartment building where he shared a residence with his parents and that he heard one of his companions, Brian Stein, say "[W]atch out.  Look at that dude.  He don't look right."  Nevels testified that he and his friends had been standing inside a fence which enclosed the building's entry way, and that at Stein's words, he turned toward the fence gate and saw an individual on the outside of the gate, approximately five feet from him.  The individual was wearing all black, including a black sweatshirt with a hood covering his head, and a bandanna covering the portion of his face from the tip of his nose down. Nevels heard the person say "What's up, folks?" and then saw him reach into a pocket at his waist and pull out a handgun.  Nevels tried to close the gate, but was hit in the chest by a gunshot and fell to the ground.  He heard several more shots and saw the gunman run away from the scene.  Nevels testified that he had not

2

seen the gunman before the incident.

Antonio Branham testified that he lived with his family in a different apartment in the same building as Nevels and that he was one of the five standing outside the building at the time of the shootings. He said that his attention had not been directed toward the street until he heard the words "What's up, folks?" He turned around upon hearing the words, saw a person pointing a gun at him from a distance of three to five feet, and was shot in the shoulder and both legs. Branham further testified that he heard between five and nine shots fired in total. His description of the gunman's clothing matched that given by Nevels, and he also described the man as having a scar above his left eyebrow and a "fat, wide" nose. Antonio described himself as 6 feet, 4 inches tall, and said that the gunman was shorter.

Antonio's brother Guillermo Branham also testified that he was present at the time of the shooting. He testified that he saw the gunman walking toward their group on the other side of the street and that he observed the gunman's approach from a distance of approximately 13 feet away to a distance of 4 or 5 feet. Guillermo's description of the gunman's clothing was substantially identical to that of Nevels and his brother: dark clothing, hooded sweatshirt, and a bandanna covering the bottom portion of his face. Guillermo testified that despite the bandanna, he took notice of the gunman's nose, and that it was "wide and puffy." He described himself as 6 feet tall, and said

3

that the gunman was shorter than himself. Guillermo also heard the gunman say, "What's up, folks?" and saw him pull a handgun from his waist and start firing. He saw his brother being struck by the shots and saw Nevels also struck as he tried to close the gate they stood inside. Guillermo saw the gunman run away from the scene.

Guillermo testified that when police showed him a number of photographs the following day, he identified Barnes' picture as that of the gunman. He said that he had seen Barnes before the night of the shooting: he had previously seen Barnes coming in and out of the apartment building where the shooting took place, and that at the time of one of those sightings, Barnes had named an elementary school and asked him if he had attended it. Guillermo said that he had also seen Barnes "a couple of times" while doing maintenance work in the building where Barnes lived. Guillermo said that he had previously noticed Barnes' wide nose. Guillermo again identified Barnes as the gunman in a lineup conducted on the same day he viewed the photo array and identified Barnes again in court at trial.

On cross-examination, Guillermo testified that he had not noticed a scar over Barnes' eye; that he did not identify Barnes as the gunman at the time of the attack; and that he concluded that he knew the gunman only after he had helped take his brother to the hospital. He further testified that although the gunman's nostrils were covered by the bandanna, he was able to see the

4

portion of his face from the area above the tip of the nose to the an area just below the top of his forehead. Guillermo also said that although the incident occurred at night, some light from the apartment building entrance brightened the scene.

Barnes did not present evidence in his defense. His counsel argued that the identification testimony lacked reference to numerous specifics of the gunman's appearance: complexion, presence or absence of facial hair, age and weight. Defense counsel also argued that there was no evidence that any of the witnesses had described the gunman to police as having a distinctive nose, and that the police reports did not reflect any indication that any witness reported knowing the gunman prior to the shooting.

The trial court noted that Barnes had "very unique" features, and specifically referred to the scar identified by Antonio Branham and the wide nose mentioned by both Branham brothers. The court further noted that Guillermo had encountered Barnes on a number of occasions and that he had an opportunity to observe Barnes approaching the group from across the street and firing at them from a distance of 5 feet. The court then found that firing a gun at an individual from such a short distance was evidence of intent to kill that individual, and accordingly found Barnes guilty of attempted murder, two counts of aggravated battery with a firearm, and two counts of unlawful use of a weapon by a felon.

1-03-2334

At his sentencing hearing, Barnes denied that he had committed the shootings.  He also suggested that he had not been satisfied with the defense presented on his behalf:

"And your honor, I mean to say that I really don't feel like I had a fair chance at this, your Honor, due to the simple fact that I wasn't able to really prepare myself.  You know, I asked for transcripts, your Honor, and I never received them.  I asked them to investigate witnesses on my behalf, but it never happened.

Witnesses on my behalf, your Honor, I could have proved to you, your Honor, that I was nowhere in sight around 1524 West Pratt, your Honor, at 1:00 or 2:00 in the morning because I had no business being outside at that time, not when I'm on probation, I know."

The trial court was not persuaded by Barnes' contentions:

"One thing you mentioned that your lawyers didn't investigate certain witnesses or didn't give you any transcripts.  That relationship between your lawyer is between you and your lawyer.

Nothing was ever brought to my attention during the court that work was not being done.  This is the first time that you're saying that, and your lawyers had plenty of time to prepare the case, and nothing was ever said previous to that.  So, that has to do with

6

legal strategy, and that was between you and your lawyers, and I don't have anything to do with that."

The court first pronounced Barnes' sentence on the attempted murder conviction: "At this time, the defendant shall be sentenced to - - it will be ten years on the Class X felony plus fifteen years under the statute which says since he was armed with a firearm. That'll be twenty-five years in the Illinois Department of Corrections." Barnes was also sentenced to six-year terms for each of the two aggravated battery counts and five-year terms for each of the unlawful use of weapon counts, with all sentences to be served concurrently.

In a motion to reconsider his sentence, Barnes advised the court that the enhancement provision that added 15 years to an attempted murder sentence where a firearm was used (720 ILCS 5/8-4(c)(1)(B) (West 2000)) had been held unconstitutional by our supreme court. (People v. Morgan, 203 Ill. 2d 470, 491 (2003).) The court granted Barnes' motion to reconsider the 25-year sentence for the attempt murder conviction, and resentenced him to a 17-year prison term for that offense. Barnes' motion for reconsideration of that sentence was denied, and this appeal followed.

DISCUSSION

Sufficiency of Identification Evidence

Barnes first contends that he was not proved guilty of the charged offenses beyond a reasonable doubt because the

7

identification testimony against him was insufficient to allow a reasonable trier of fact to find him guilty of the crimes. He correctly notes that the factors to be considered in evaluating the reliability of an identification are (1) the opportunity of the witness to view the offender at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the offender; (4) the level of certainty shown by the witness at the identification confrontation; and (5) the length of time between the crime and the confrontation (People v. Curtis, 262 Ill. App. 3d 876, 881 (1994)), and contends that the identification here was unreliable because the gunman wore a hood and a bandanna, covering most of his face; because the incident happened quickly; because it was dark; and because Guillermo Branham's identification rested solely on his characterization of Barnes' nose.

None of the claimed identification shortcomings render the testimony against Barnes sufficiently unreliable that his convictions must be disturbed. Illinois courts have consistently rejected challenges to identifications under circumstances similar to, and even less favorable than, those surrounding the testimony in the instant case.

Though the witnesses testified that most of the gunman's face was covered by a bandanna at the time of the attack, both Antonio Branham and his brother Guillermo testified that enough of the attacker's nose was uncovered to allow them to see that it

was notably wide. In <u>People v. Zarate</u>, 264 Ill. App. 3d 667 (1994), this court rejected the contention that a perpetrator's disguise made an eyewitness identification unreliable. There, the identification was found to be sufficiently positive and reliable to support a conviction even though the witness, the victim of an assault in her home, was able to view her attacker's face only through eye holes in a bag he wore over his head to conceal his identity. 264 Ill. App. 3d at 674-75.

This court has similarly rejected the claim that brevity of the witness's observation undermines his identification testimony: in <u>People v. Parks</u>, 50 Ill. App. 3d 929, 930-33 (1977), an encounter as abbreviated as "five to ten seconds" (50 Ill. App. 3d at 930) was held to be sufficient to support a conviction. We have also held that testimony based on night observations illuminated only by artificial light may serve as proof of identification beyond a reasonable doubt. <u>People v. Griffin</u>, 12 Ill. App. 3d 193, 198-200 (1973).

Barnes makes much of the fact that the identification testimony of the Branham brothers centered primarily on his nose; he notes that Guillermo failed to mention a prominent scar above his eye and that neither brother offered any details about numerous other physical characteristics of the gunman, such as weight, age, or complexion. Our supreme court, however, has held that omissions in the description offered by a witness do not render his testimony unreliable. <u>People v. Slim</u>, 127 Ill. 2d

9

1-03-2334

302, 309 (1989).  Illinois courts have consistently adhered to this principle, repeatedly holding that identification testimony which fails to mention notable physical characteristics of the defendant may nonetheless prove a defendant's guilt beyond a reasonable doubt.  People v. Miller, 30 Ill. 2d 110, 113 (1964); People v. Nims, 156 Ill. App. 3d 115, 121 (1986); People v. Bias, 131 Ill. App. 3d 98, 105 (1985).

Citing People v. Dowaliby, 221 Ill. App. 3d 788 (1991), Barnes claims that identification testimony focusing primarily on his nose is inherently vague and insufficient to support a finding of guilt beyond a reasonable doubt.  While the Dowaliby court did find identification testimony focusing on the appearance of a nose to be "doubtful, vague, unreliable and of no probative value," (221 Ill. App. 3d at 800) the testimony at issue in the instant case is readily distinguishable.

In Dowaliby, the witness whose testimony served as identification of the defendant stated that he had observed "the profile of a large nose."  221 Ill. App. 3d at 800.  The witness did not note any other characteristics of the individual, and did not identify a photograph of the individual as the person he had seen, stating only that the defendant's nose structure "looked similar to the profile nose structure of the person he saw."  221 Ill. App. 3d at 800.  The witness did not identify the defendant in court as the person he had observed at the crime scene.  221 Ill. App. 3d at 800.

10

1-03-2334

It is thus apparent that, in contrast to the instant case, the witness in Dowaliby failed to make a positive identification of the defendant. It is equally apparent that the Dowaliby court did not suggest that a positive identification may not be made on the basis of a witness observation of a distinctive nose. We therefore conclude that Dowaliby offers no basis for a reversal of Barnes' conviction.

We find Barnes' remaining assertion of evidence insufficiency to be equally unpersuasive: he argues that Guillermo Branham admitted that he "wasn't really paying attention" and that his "mind really wasn't focused." The full context of Guillermo's comments reveals that he stated that he was not paying attention to the gunman's eye structure, and that his recognition of Barnes as the attacker did not occur to him until he was at the hospital because his mind was not focused on identifying the shooter while he was attending to his brother and his friend.

The testimony of a single credible witness with ample opportunity to make a positive identification is sufficient to convict. People v. Jefferson, 183 Ill. App. 3d 497, 501 (1989). The persuasiveness of identification testimony is strengthened by the witness's prior acquaintance with the accused. People v. Milam, 80 Ill. App. 3d 245, 251 (1980). On review, the verdict delivered by a court presiding at a bench trial will not be overturned unless it is so unsatisfactory, improbable or

11

implausible as to justify a reasonable doubt as to the defendant's guilt.  People v. Slim, 127 Ill. 2d 302, 307 (1989).

Guillermo Branham's identification of Barnes was positive and consistent in selecting Barnes' picture from the photo array, in choosing him from a lineup, and in naming Barnes as the gunman at trial.  The identification was bolstered by the fact that he had encountered Barnes on multiple occasions prior to the night of the shooting.  Guillermo's identification was corroborated by his brother's testimony that the gunman had a scar over his eye and a wide nose, and the trial court noted that those features were "unique."  In light of the foregoing, and in light of the consistent rejection by Illinois courts of the arguments asserted by Barnes as bases for considering the testimony against him to be unreliable, we must conclude that the evidence presented was sufficient to prove beyond a reasonable doubt that Barnes was the perpetrator of the charged crimes.


## Sufficiency of Intent Evidence

Barnes contends that the prosecution failed to prove beyond a reasonable doubt that he had the intent to kill Joseph Nevels, and that his conviction for attempt murder must therefore be reversed.  In support of this contention, Barnes notes that no evidence was presented to indicate that Barnes knew Nevels, was aiming at him, or had any intent to kill him.  He concludes that in the absence of such evidence, the trier of fact could at most

infer that he acted recklessly, but not that he intended to kill. We disagree.

"'Intent is a state of mind which, if not admitted, can be established by proof of surrounding circumstances, including the character of the assault, the use of a deadly weapon, and other matters from which an intent to kill may be inferred. [Citations.] Such intent may be inferred when it has been demonstrated that the defendant voluntarily and willingly committed an act, the natural tendency of which is to destroy another's life.'" People v. Green, 339 Ill. App. 3d 443, 451 (2003), quoting People v. Winters, 151 Ill. App. 3d 402, 405 (1986). In Green, this court held that the act of shooting at a group of police officers was sufficient proof of intent to kill to support a conviction for attempt murder. Green, 339 Ill. App. 3d at 452. Similarly, in People v. Bailey, 265 Ill. App. 3d 262 (1994), this court held that shooting at a group was an act sufficient to prove the intent necessary to sustain an attempted murder conviction. "To sustain a charge of attempted murder, it is sufficient to discharge a weapon in the direction of another individual, either with malice or total disregard for human life." Bailey, 265 Ill. App. 3d at 273. Given the fact that Barnes fired several shots at the victims, the fact that two separate victims were in fact struck, and the well-established principle that such conduct is sufficient to support an attempted murder conviction, we conclude that Barnes' argument must be

13

rejected.

### Length of Resentence for Attempted Murder

Barnes next contends that the trial court, in imposing a 17-year sentence for the attempted murder charge after discovering the invalidity of the enhancement provision originally utilized to impose a 25-year sentence, improperly violated section 5-8-1(c) of the Unified Code of Corrections (730 ILCS 5/5-8-1(c) (West 2000)), which provides that a court "may not increase a sentence once it is imposed."  Since the 17-year term imposed upon resentencing is less than his original 25-year attempted murder sentence, Barnes' argument necessarily presumes that the trial court's recognition of the invalidity of the enhancement statute left a valid 10-year sentence which could not then be increased.  We do not agree with this presumption.

Initially, we note that while the trial court referred to the attempted murder sentence by reference to its component parts, 10 years plus a required 15-year enhancement, neither the language of the statute nor the trial court's ultimate pronouncement of sentence suggests that the penalty imposed for attempted murder consisted of distinct, independent prison terms rather than a single 25-year sentence.

Barnes notes that in People v. Baker, 341 Ill. App. 3d 1083 (2003), the Appellate Court for the Fourth District held a sentencing enhancement provision to be constitutionally invalid, and as a result vacated the enhanced portion of the prison term,

1-03-2334

However, the Fourth District subsequently emphasized that <u>Baker</u> did not purport to mandate this remedy: "This court did not hold, as defendant contends, the defendant's sentence in <u>Baker</u> had to be set at 25 years as a result of subtracting the 15-year enhancement from the 40 years imposed initially by the trial court." <u>People v. Ridley</u>, 345 Ill. App. 3d 1091, 1093 (2004). The <u>Ridley</u> court affirmed the imposition of a 15-year prison sentence following the vacation of a 21-year sentence consisting of a 6-year base sentence plus an invalid 15-year enhancement. 345 Ill. App. 3d at 1093-94.

In addition, the instant case arises from a factual background significantly distinct from that outlined in <u>Baker</u>. Here, the trial court explicitly indicated that it took the mandatory enhancement provision into account in imposing the original sentence: "My original sentence was based on the fact defense counsel at the time never asked to find the sentencing guidelines unconstitutional so I stated previously that it was not that I wanted to sentence him to that amount of years. It was because in addition to how much I would have to sentence to the required extra amount of sentencing that is why I chose the years. It was not my intention to sentence him to ten years at the time." No similar evidence of commingled analysis was noted by the <u>Baker</u> court. The trial court's acknowledgment in the instant case of the inclusion of the invalid enhancement provision in its initial sentencing analysis demonstrates that

15

the 25-year term imposed in the case at bar cannot be viewed as divisible into separate, independent parts.

Barnes' initial sentence was imposed by the trial court under an erroneous belief that the enhancement provision declared unconstitutional in <u>Morgan</u> required a 15-year increase in his sentence. This belief was a mistake of law which rendered the sentence entered on the charge voidable. <u>People v. Harris</u>, 319 Ill. App. 3d 534, 536 (2001).

However, our supreme court has held that only valid sentences may serve as the baseline for assessment of compliance with prohibitions against increase. In <u>People v. Garcia</u>, 179 Ill. 2d 55 (1997), the court reviewed a contention that a sentence imposed after a remand was greater than that originally entered, in violation of a statutory no-increase provision similar to that at issue here. The <u>Garcia</u> court held the defendant's original sentence to be void and therefore found the defendant's contentions of violation of the no-increase provision to be "inapplicable because they are premised on the erroneous assumption that there is a valid sentence to increase." 179 Ill. 2d at 73.

Though Illinois courts distinguish the terms "void" and "voidable" for the purposes of determining the propriety of collateral attacks (<u>People v. Davis</u>, 156 Ill. 2d 149, 155-56 (1993)), that distinction does not bear upon on the issues raised by the instant case, since Barnes' original sentence was properly

vacated upon his motion for resentencing. We conclude that the supreme court's rejection of invalid sentences as comparison baselines for no-increase provisions applies with equal force to both properly vacated voidable sentences and the void sentences at issue in Garcia and in People v. Arna, 168 Ill. 2d 107, 112-13 (1995).  We accordingly hold that the imposition of a 17-year prison term on resentencing of the attempted murder charge was not an impermissible violation of the prohibition against sentence increases.

## Ineffective Assistance Claims

After trial, Barnes advised the court that he did not feel that he had "a fair chance" at trial; that he had asked his attorney for transcripts that he did not receive and that his requests for interviews of witnesses who could have testified that he was not at the crime scene at the time of the shooting were not heeded.  As noted previously, the trial court, without further analysis, responded: "Well, Keith, you've touched upon several things.  One thing you mentioned that your lawyers didn't investigate certain witnesses or didn't give you any transcripts.  That relationship between your lawyer is between you and your lawyer.  Nothing was ever brought to my attention during the court that work was not being done.  This is the first time that you're saying that, and your lawyers had plenty of time to prepare the case, and nothing was ever said previous to that.

17

So, that has to do with legal strategy, and that was between you and your lawyers, and I don't have anything to do with that." Barnes contends that the court should have inquired further into his claims. We agree.

In People v. Moore, 207 Ill. 2d 68 (2003), our supreme court made clear that a defendant's *pro se* claims of ineffective assistance of counsel following trial must receive at least some investigation. "[W]hen a defendant presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court should first examine the factual basis of the defendant's claim. If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed." 207 Ill. 2d at 77-78.

The court continued: "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel. People v. Johnson, 159 Ill. 2d 97, 125 (1994). During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." Moore, 207 Ill. 2d at 78. Illinois courts have also

18

1-03-2334

made clear that this claim need not be written to require such inquiry. People v. Williams, 224 Ill. App. 3d 517, 524 (1992).

In the instant case, Barnes claimed that, to no avail, he had asked to review transcripts and had advised his counsel of witnesses who could have proved that he was not at the scene of the crime. Without inquiry into the substance of these allegations, the trial court presumed them to be matters of trial strategy and summarily rejected them. We do not believe that this brief conclusory review satisfies the requirement for factual assessment described by the Moore court. We believe that before dismissing Barnes' claims, the court must conduct some inquiry into their specifics: what transcripts Barnes requested but did not receive, and the identities of the claimed alibi witnesses, the substance of their proposed testimony, and the extent to which Barnes' counsel was made aware of and acted upon any knowledge of their existence. Accordingly, we remand the cause for a preliminary inquiry into Barnes' ineffective assistance claims.

CONCLUSION

For the foregoing reasons, we affirm the convictions and sentences imposed by the circuit court of Cook County. We remand the cause to that court for further inquiry into the defendant's claims of ineffective assistance of counsel.

Affirmed and remanded.

FITZGERALD-SMITH and O'MALLEY, JJ., concur.

19