2025 IL App (1st) 231600-U

No. 1-23-1600

Order filed June 2, 2025

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 13 CR 9116-02 |
| | ) | |
| DAMIEN GARZA, | ) | Honorable |
| | ) | James B. Linn, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's 34-year sentence for first degree murder is affirmed where the sentence
on remand was not more severe than the original sentence and is not excessive.

¶ 2    Defendant Damien Garza appeals from a resentencing where the trial court, in relevant

part, imposed a 34-year sentence for first degree murder. On appeal, defendant contends that his

murder sentence (1) constitutes an improper sentence increase from his initial "base sentence" of

25 years for murder and (2) is excessive in light of the mitigating evidence presented at resentencing. For the reasons that follow, we affirm.

¶ 3     We set forth the underlying facts of this case in detail in our prior order on direct appeal and our order remanding for second-stage proceedings under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)), concluding, *inter alia*, that the sentencing court had not given any particularized consideration to defendant's youth and its attendant characteristics. See *People v. Garza*, 2018 IL App (1st) 1152324-U, ¶¶ 4-11; *People v. Garza*, 2021 IL App (1st) 192573-U, ¶¶ 4-12. We briefly recount the facts here to the extent necessary to resolve the issues raised on appeal.

¶ 4     On the afternoon of April 7, 2013, defendant, who was 19 years old, pulled up in a minivan across the street from five teenagers who were walking to an ice cream shop. Defendant and one of his passengers displayed gang signs to show disrespect to a rival gang. One of the teenagers on the sidewalk stepped toward the minivan and also displayed gang signs. At that point, 17-year-old Javier Garza exited the minivan from the sliding back door, shouted a gang slogan, drew a handgun, and fired three to four shots at the group on the sidewalk.[1] Javier stepped back into the minivan, and defendant drove off. Shortly thereafter, defendant led the police on a high-speed chase that ended when he crashed into a group of parked vehicles. One of the teenagers on the sidewalk suffered three gunshot wounds to the back and died from his wounds. Another teenager removed a "piece of metal" from her leg at the scene.

---

[1] As Javier Garza and defendant have the same last name, we refer to Javier by his first name. Javier and defendant are not related.

¶ 5 Following a 2015 trial, a jury found defendant guilty of one count of first degree murder (720 ILCS 5/9-1(a)(1) (West 2012)), one count of aggravated battery with a firearm (720 ILCS 5/12-3.05(e)(1) (West 2012)), and three counts of aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2012)). The trial court imposed an aggregate sentence of 50 years in prison: a 40-year term for first degree murder, a consecutive 10-year term for aggravated battery with a firearm, and a concurrent 6-year term for aggravated discharge of a firearm. With regard to defendant's murder sentence, the trial court first stated, "For first-degree murder, 40 years in the penitentiary." Shortly thereafter, when asked by the State about a firearm enhancement that was mandatory at the time (see 730 ILCS 5/5-8-1(a)(1)((d)(i) (West 2012)), the court clarified, "When I said 40, I meant 25 plus 15." We affirmed on direct appeal. *Garza*, 2018 IL App (1st) 1152324-U.

¶ 6 Defendant thereafter filed a *pro se* petition for relief pursuant to the Act, which the circuit court summarily dismissed. On appeal, defendant, noting he was 19 years old at the time of the offense and had been convicted on a theory of accountability, contended that his petition set forth the gist of an arguable constitutional claim that his 50-year sentence violated the proportionate penalties clause of the Illinois Constitution. We reversed and remanded for second-stage proceedings under the Act, concluding, *inter alia*, that the sentencing court had not given any particularized consideration to defendant's youth and its attendant characteristics. *Garza*, 2021 IL App (1st) 192573-U, ¶¶ 40, 49.

¶ 7 On remand, the circuit court vacated defendant's sentence by agreement of the parties. At defendant's request, the court also entered an order directed to the Cook County Department of Corrections (CCDOC), stating that defendant was allowed to have his face tattoos removed if that

service was available. On July 19, 2023, a resentencing hearing was held for defendant and Javier, who is not a party to this appeal.

¶ 8     At the hearing, the State reviewed the facts of the case and referenced the previously-submitted victim impact statements from the murder victim's mother, the teen who removed the metal from her leg, and another teen who had been part of the group on the sidewalk.

¶ 9     The defense entered into evidence a 6-page report from a psychiatrist and a 32-page mitigation report from a forensic social worker. The trial court acknowledged receipt of the reports.

¶ 10    The psychiatric report was prepared by Dr. Michael J. Byrne, based on an approximately three-hour interview with defendant and a review of court documents, CCDOC treatment records, and a "report completed by Forensic Clinical Services." Dr. Byrne opined that, at the time of the offense, defendant "was operating as a functional equivalent to that of a juvenile." He further opined that several factors should be considered as mitigation. First, defendant's age, level of immaturity, and learning disability reduced his ability to appreciate the risks and consequences of his actions. Second, defendant was subject to considerable negative influences, including significant gang and criminal activity. Third, defendant was raised in a neglectful home environment, was exposed to significant trauma of shootings, and had a limited education. Fourth, defendant demonstrated potential for rehabilitation, as he had expressed interest in obtaining a GED, had pursued steps to remove his tattoos, and had post-release plans to work as a truck driver, in construction, or with cars.

¶ 11    Fifth, defendant did not initiate or plan the offense and was not the shooter. According to Dr. Byrne, defendant was a "federal informant" with a contact at the FBI. On the day of the shooting, defendant thought he and other gang members "would ride around and, at most, would

get out and chase someone from an opposing gang." Defendant did not expect anyone to die. He "was reluctantly forced to join the more senior members of his gang on the drive" and, though he did not want to go, "thought he had no choice because he feared that they suspected he was an informant, and his failure to go with them would signal that he in fact was," which would lead to the other gang members killing him.

¶ 12    Sixth, defendant had limited capacity to participate in his defense at his initial trial and sentencing, due to his relative youth and poor education. Finally, defendant expressed remorse for his actions. He told Dr. Byrne he regretted his involvement in gangs, which he had joined for money, safety, and security.

¶ 13    The mitigation report was prepared by Caryn Tatelli, AM, LCSW, based primarily on interviews with defendant and his family members. Tatelli reported that defendant was raised by his mother, April Chretien, who never married or lived with defendant's father, Christopher "Big Chris" Garza, although they had five children together. Big Chris also had five children with his wife, Trinidad Chiquito. Tatelli conducted an Adverse Childhood Experiences (ACEs) questionnaire with several of defendant's family members to assess defendant's childhood trauma exposure.

¶ 14    Big Chris initially refused to participate in the mitigation investigation. When he finally agreed, he only reported two circumstances that scored on the ACEs questionnaire: Big Chris's grandfather had a substance abuse issue and Big Chris's father had gone to jail.

¶ 15    Defendant's stepmother, Chiquito, reported that she helped raise Chretien's children at various points in time because Chretien was an addict. The first time Chretien's children came to live with Chiquito, they were dirty and disheveled and had lice. Chiquito reported that each time

the children came to her home from Chretien's, they arrived "with a new bad habit—gangs, drugs, doing the drugs, selling the drugs, drinking." Big Chris disciplined all the children by whipping them, was harsher with Chretien's children than Chiquito's, and sometimes disciplined Chretien's children at Chretien's request.

¶ 16    Chretien reported that she began using drugs to cope with the traumatic death of her mother, who was accidentally shot and killed by Chretien's uncle. At age 15, Chretien became pregnant and dropped out of school. She then met Big Chris. She was infatuated with his "prestige" as a person of authority in a gang, his money, and his power. In time, she learned he was violent and abusive. She had five children with Big Chris. Her drug and alcohol use accelerated during their formative years, she was unable to hold a job, and she did not have stable housing. When the Department of Children and Family Services (DCFS) became involved, she "gave" the children to Big Chris rather than have them enter the foster care system. She also spent nights in jail "here and there" for "fighting, shoplifting, and drugs," and, at one point, pled guilty to a charge in exchange for her agreement to participate in a two-year intensive drug probation program. Chretien admitted she still used drugs and alcohol.

¶ 17    Defendant's older half-brother, Christopher "Gonzo" Garza, reported that defendant's brain was "not fully developed" at the time of his arrest.[2] When Chretien's children were young, she taught them how to steal and had them steal food and clothing. Big Chris was "ruthless," smoked marijuana in front of his children, glorified his gang involvement to them, and kept an array of firearms under the cushions of the sofa in the living room. He was mentally and physically

---

[2] As defendant and his siblings Christopher "Gonzo" Garza, Christopher Garza, and Steven Garza have the same last name, we refer to them by their first names or nickname.

abusive, especially with defendant and defendant's younger full-brother, also named Christopher. Gonzo reported that he and his other full-siblings bullied defendant.

¶ 18    Defendant's half-brother, Steven Garza, who was born five weeks before defendant, reported that Big Chris was physically and emotionally abusive. Steven felt that Big Chris "alter[ed] their growth mentally," stating, "I feel like he did that with all of us—we didn't really have a childhood because of the way we grew up." While his own mother was a positive role model, Chretien taught her children how to steal, cut tires, and roll joints.

¶ 19    Defendant reported to Tatelli that, as a child, he attended school in Chicago when he was living with Chretien and in Rockford when he was living with Big Chris. However, after fourth grade, if he was in Chicago, he did not attend school. The last school he attended was an alternative high school. At age 18, he was shot in the foot and ribs by a rival gang member. Defendant also indicated to Tatelli that he had been sexually abused.

¶ 20    Tatelli set forth several examples of how defendant functioned as a juvenile. Specifically, defendant decided not to complete his education or find a job to "make himself useful." He engaged in "long-standing silent treatment" with his father and paternal half-siblings. During a period when he lived with his elderly and "unwell" great-grandmother, he smoked in her home and showed no consideration for her health. After she moved out, he failed to pay the rent for the apartment and was evicted. Finally, in the days preceding his sentencing hearing, defendant demonstrated a "child-like perseveration around his desire for a haircut [that] took on a tantrum-like quality" and prevented important preparation for the hearing.

¶ 21    Tatelli opined that defendant had clearly grown during his incarceration. As evidence of growth, she noted "his positive correctional adjustment," more mature interactions with family

members, and "heart-felt remorse." She related that defendant had expressed deep regret about his tattoos. Defendant told her he planned to use his opportunity to speak at the resentencing hearing to apologize to the court for his behavior at his initial sentencing hearing, as well as to apologize to the victims' families, whom he knew would relive their loss at the hearing. Defendant also recognized that his own family had been hurt and adversely affected by his role in the offense and his incarceration, and stated he was deeply sorry not to have been present and fully engaged as a parent for his son.

¶ 22    Tatelli reported that defendant's Illinois Department of Corrections (IDOC) disciplinary tracking card covering July 2, 2015, through November 17, 2021, revealed 19 disciplinary incidents, 18 of which were categorized as "major." Of those 18, Tatelli reported that only three were "serious in nature." First, on July 2, 2015, defendant was cited for assault when he squirted an unidentified liquid at another inmate; on February 7, 2020, he was cited for assault, dangerous disturbance, fighting, and disobeying a direct order; and on November 17, 2021, he was cited for sexual misconduct, disobeying a direct order, insolence, and abuse of privileges when he was caught masturbating during a visit. Tatelli stated that, while defendant's offenses were considered major infractions within IDOC, he never caused harm to anyone in a position of authority, and the vast majority of his infractions related to the violation of basic rules. She opined that the nature of his disciplinary incidents while incarcerated showed he did not have a propensity for violence and was "able to abide by the rules."

¶ 23    The defense also presented four mitigation witnesses at resentencing.

¶ 24    Steven testified that Big Chris had five children with Steven's mother, Chiquito, and six children with defendant's mother, Chretien. Steven first met defendant when defendant was five

or six years old and defendant and Chretien's other children moved in with Steven's family. Defendant looked malnourished and had head lice. Chiquito "tried to give them a better life from what they had when they were living with [Chretien]." Big Chris would discipline his children by spanking them or, sometimes, using a belt or a stick, and he disciplined defendant more frequently than Steven. He smoked marijuana in front of the children and was involved in a gang. According to Steven, Big Chris's family members were "all gang involved."

¶ 25    Christopher, defendant's younger full-brother, testified that he was serving a 28-year sentence for first degree murder. He stated that Chretien was intoxicated "most of [his] juvenile life" and used crack cocaine and marijuana. When she was high and could not "deal with" her children, she would send them to Big Chris, who beat defendant and Christopher. Defendant and Christopher were not allowed as much access to food as the other children, so they committed robberies and sold drugs. Chretien and Big Chris introduced them to drugs when they were between 9 and 11 years old, in exchange for help with cleaning or "to get [them] out of [Chretien's] face." Both Chretien and Big Chris were involved in gangs, and Christopher joined his father's gang "to get more attention from him." While living with Big Chris, defendant and Christopher ran away and "went to the streets for the love, for the affection and for attention." According to Christopher, defendant always protected him.

¶ 26    Chiquito testified that Big Chris functioned as a stay-at-home parent while she worked outside the home. A few years after she started dating Big Chris, she learned about Chretien and Chretien's children with Big Chris. Then, when Chiquito's children were young, a DCFS worker told her that Chretien's children were in DCFS custody. Later that year, Chiquito took Chretien's children in. They were malnourished, dirty, lice-ridden, and wore ill-fitting clothes. The children

lived with Chiquito for about a year and a half, returned to Chretien for a year or two, and then came back to Chiquito, in a "similar condition." Chiquito acknowledged that Big Chris would discipline the children by spanking them and, before Chretien's children moved in, would slap her.

¶ 27 Chretien testified that she had six children with Big Chris, whom she met "on the street." Big Chris was a gang member, and Chretien "hung out" with two different gangs. Big Chris smoked marijuana, and she used marijuana, cocaine, and other drugs. Big Chris abused Chretien and their children "a lot," hitting them with his hands, a belt, or "whatever was laying nearby." Most of Big Chris's family members were involved with gangs. Chretien testified that she made "a lot" of mistakes as a parent and blamed herself and Big Chris for defendant's troubles.

¶ 28 In allocution, defendant first apologized to the murder victim's mother. He then stated that he had misled Javier, said he was sorry for Javier and his family, and apologized to his own family. Defendant explained that he had been young and stupid, and that he had had time in custody to think about his mistakes. After expressing remorse to the murder victim's mother again, defendant asked the court to see that he had changed and that he was taking responsibility for mistakes he made when he was younger.

¶ 29 The State noted that "[w]e're here pursuant to *Miller* [*v. Alabama*, 567 U.S. 460 (2012)] and that line of cases." The State then listed factors that the court was to consider, including defendant's and Javier's "age, impetuosity, the level of maturity at the time of the offense, whether they were subject to outside pressures, family, home environment, educational or social background, potential for rehabilitation or evidence [*sic*], the circumstances of the offense, their degree of participation, specific role in the offense, whether they were able to meaningfully participate in their [de]fenses, prior juvenile or criminal history and then anything else you deem

relevant." The State argued that the court had carefully weighed all the relevant factors when it originally imposed sentence, reminded the court of the impact of the shooting on the victims and their families, and reviewed the court's prior statements at sentencing.

¶ 30    The State expressed that it appreciated defendant's statements in allocution. However, it also pointed out that, as documented in defendant's own mitigation report, between July 2015 and November 2021, he accrued 18 major disciplinary incidents, including assault, dangerous disturbance, fighting, disobeying a direct order, sexual misconduct, and insolence. The State argued that defendant's conduct while incarcerated indicated that he was "not making the most of his opportunities." As such, the State urged a sentence "well in excess of the minimum."

¶ 31    Defense counsel argued that defendant's behavior at the time of the crime, at the time of his arrest, and in court at the time of trial showed that he "was acting like an immature child." Counsel noted that Dr. Byrne's report showed defendant was "delayed" and had been diagnosed with a learning disability. As such, counsel asserted that *Miller* considerations should apply. Counsel further argued that defendant's whole family was gang-involved, that his mother "sent him out to sell drugs and commit burglaries," and that his juvenile conviction was the result of him taking "the rap" for his mother's drug possession when her house was raided. Counsel argued that defendant was ordered by an older gang member to drive Javier to the location of the shooting, and had defendant refused, the gang would have realized that he "was working with the FBI against the gang."

¶ 32    Counsel stressed that defendant's mother was unable to care for him, his father was abusive, and his stepmother's attempts to parent were hindered by her relationship with Big Chris. As to potential for rehabilitation, counsel asserted that many programs were not available where

defendant was incarcerated. Counsel emphasized that defendant was not the shooter and had "very little" criminal history. Counsel stated that defendant was "180 degrees different than the young man *** at trial," in that he had grown into a respectful person, was remorseful, and had "tried to get his tattoos removed" but was unable to do so in the CCDOC. Finally, counsel asked the court for mercy.

¶ 33    The court noted that defendant's and Javier's cases had been on the docket for over 10 years. It stated that, in that time, nothing had changed factually about what happened on the day of the shooting, and nothing had changed for the shooting victim or for the murder victim's family. Rather, the court noted that the difference between the first sentencing and the resentencing hearing was "just that the law has changed." Specifically, the court stated:

> "What has happened, though, is that the law in multiple jurisdictions, from the United States Supreme Court, to Illinois law, to—both from our Supreme Court, other Courts' review, new statutes, there's a different dynamic now about how you sentence young people. The only thing I have that's different that's worthy of any consideration, of course, is exactly that."

¶ 34    The court then remarked that the younger offender, Javier, was the shooter and the older offender, defendant, was accountable as "the driver for what was a premeditated drive-by shooting." Noting that defendant admitted in allocution that he had misled Javier, the court found that defendant "was really the leader between the two" and that, "[b]ut for him, I don't believe Javier would have been involved in this case."

¶ 35    The court stated that the aggravation and mitigation "cut a couple of ways." It acknowledged that, compared with the initial sentencing, it could now consider new factors and

had more discretion. It stated that it had to account for defendant's and Javier's "terrible upbringings" and try to understand how they got to where they are but, also, question how their pasts might impact their ability to be rehabilitated, stating, "And, frankly, it may diminish some of that ability."

¶ 36    Noting again that it now had more discretion at sentencing due to defendant's and Javier's youth, the court observed that the sentences available for murder were "tough" and concluded that firearm enhancements were not required to further the interests of justice. The court stated as follows:

"So let me say for the reasons of the interests and furtherance of justice, I'm not imposing gun enhancements in this case. But I do find that both these young men, and they were young at the time, committed a terrible act. And not only must I be mindful of them but I also have to be protective of the public, because I am—part of my responsibility is to do exactly that and that is to stand in the middle and be mindful of public safety. And I still believe that these men require to be away from the public for substantial periods of time, although I'm able now to look at this in a different light because of our changes in the law."

¶ 37    Remarking that it had listened to "everything that's been presented on behalf of [defendant]" and that "[t]here will be some relief" for him, the court imposed a 34-year sentence for first degree murder, a consecutive 6-year sentence for aggravated battery with a firearm, and a concurrent 6-year sentence for aggravated discharge of a firearm. The court stated, "That's a total of 40 years. That's ten years less than the 50 years he came here with today."

¶ 38    Defendant filed a timely motion to reconsider sentence, which he amended, arguing, among other things, that the court did not properly apply the *Miller* factors, "especially as to the remorse."

The trial court denied the motion, noting that it had reduced defendant's total sentence to 40 years and stating, "I don't believe I misapplied the law in the way I heard the evidence and considered the facts in the case and his background and all the other circumstances involved." Defendant filed a timely notice of appeal.

¶ 39 On appeal, defendant contends that his current 34-year murder sentence constitutes an improper sentence increase from his initial "base sentence" of 25 years for murder, to which a then-mandatory 15-year firearm enhancement had been added. He acknowledges that he did not preserve this issue for appellate review but maintains that we may nevertheless reach his claim as a matter of plain error or because trial counsel was ineffective for failing to object to the sentence increase.

¶ 40 The plain error doctrine is a narrow and limited exception to forfeiture. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). To obtain relief under this doctrine in the sentencing context, a defendant must show either that (1) the evidence at the sentencing hearing was closely balanced, or (2) the error was so egregious as to deny the defendant a fair sentencing hearing. *Id.* To prevail on a claim of ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was objectively unreasonable under prevailing professional norms and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Whether forfeiture may be avoided under either of these theories requires us first to determine whether a clear error occurred. *People v. Garcia*, 2023 IL App (1st) 220524, ¶ 18. Here, we find no clear error.

¶ 41 Section 5-5-4(a) of the Unified Code of Corrections (Code) (730 ILCS 5/5-5-4(a) (West 2022)) governs resentencing on remand. It provides, in relevant part, as follows:

"Where a conviction or sentence has been set aside on direct review or on collateral attack, the court shall not impose a new sentence for the same offense or for a different offense based on the same conduct which is more severe than the prior sentence less the portion of the prior sentence previously satisfied unless the more severe sentence is based upon conduct on the part of the defendant occurring after the original sentencing." 730 ILCS 5/5-5-4(a) (West 2020).

¶ 42    The "purpose of section 5-5-4 of the Code is to ensure the due process rights set forth in [*North Carolina v.*] *Pearce* by preventing vindictiveness in resentencing a defendant for having exercised his appeal rights or his right to file a post-judgment motion." *People v. Woolsey*, 278 Ill. App. 3d 708, 710 (1996) (citing *North Carolina v. Pearce*, 395 U.S. 711 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)). Whether a trial court complied with section 5-5-4(a) is a matter of law we review *de novo*. *People v. Moore*, 359 Ill. App. 3d 1090, 1092 (2005).

¶ 43    Defendant argues that his original sentence for murder comprised a 25-year "base term" and a 15-year firearm enhancement, and that, at resentencing, the trial court increased his sentence to a 34-year base term with no firearm enhancement. He asserts that because Illinois law prohibits courts on remand from imposing a sentence that is more severe than the prior sentence unless the increase is based on conduct occurring after the original sentencing, this court should reverse and remand for a new sentencing hearing or, alternatively, reduce his murder sentence to 25 years.

¶ 44    We reject defendant's argument. The trial court's oral pronouncement of defendant's original sentence and the original written sentencing order make clear that it entered a single sentence of 40 years on count I, first degree murder. We are mindful that this sentence included a

15-year firearm enhancement. However, defendant has not cited, and our research has failed to reveal, any authority holding that a single sentence that includes a statutory firearm enhancement should be treated like consecutive sentences, with each component analyzed as a separate sentence, for purposes of evaluating compliance with section 5-5-4(a) of the Code. To the contrary, our research has yielded two recent, unpublished orders of this court that contradict defendant's argument and are persuasive in resolving this issue. See Ill. S. Ct. R. 23(e)(1) (eff. Feb. 1, 2023) (nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes).

¶ 45    In *People v. Vatamaniuc*, 2023 IL App (2d) 210665-U, ¶ 12, the trial court sentenced the defendant, who was 17 years old at the time of the offense, to 54 years in prison for first degree murder, a term that included a 15-year firearm enhancement. On direct appeal, this court vacated the sentence and remanded for a new sentencing hearing because, *inter alia*, the trial court had imposed a *de facto* life sentence and had provided only a cursory mention of the *Miller* factors. See *id.* ¶ 14. Following a resentencing hearing, the trial court expressly declined to impose the discretionary 15-year firearm enhancement and re-imposed a 54-year sentence for murder. *Id.* ¶¶ 22, 32.

¶ 46    On appeal, the defendant contended that the re-imposition of a 54-year sentence violated the statutory prohibition on increasing sentences on remand except for conduct occurring after the original sentencing hearing. *Id.* ¶ 34. He argued that, where his original murder sentence consisted of a 39-year "base sentence" and a 15-year firearm enhancement, and his new sentence consisted of a 54-year "base sentence" with no enhancement, the sentencing judge improperly increased his "base sentence" by 15 years. *Id.* ¶ 37.

¶ 47    This court rejected the defendant's arguments, stating as follows:

"Defendant's new sentence is not more severe than his prior sentence. His original sentence was a single, unitary, 54-year sentence based on a single count and, after this court vacated that sentence, defendant again received a single, unitary, 54-year sentence based on a single count. The sentences were both within the statutory range of 20 to 60 years for first-degree murder without any enhancement. *** [A]n original sentence within statutory limits that is increased by an enhancement results in a single sentence and not 'distinct, independent prison terms.' " *Id.* ¶ 46 (quoting *People v. Barnes*, 364 Ill. App. 3d 888, 897 (2006)).

¶ 48    The court in *Vatamaniuc* concluded that, because the defendant received on remand an identical sentence to the sentence imposed in the original sentencing hearing, the trial court did not violate section 5-5-4(a) of the Code. *Id.*

¶ 49    In *People v. Agosto*, 2023 IL App (1st) 220636-U, ¶¶ 2, 6, the trial court sentenced the defendant, who was 16 years old at the time of the offense, to 50 years in prison for first degree murder, a term that included a 25-year firearm enhancement. On appeal from the summary dismissal of his postconviction petition, this court vacated the sentence and remanded for resentencing in accordance with *Miller* and its progeny. *Id.* ¶ 3. Upon resentencing, the trial court imposed a 30-year sentence for first degree murder, expressly stating that it was not imposing the discretionary firearm enhancement. *Id.* ¶¶ 3, 21.

¶ 50    On appeal, the defendant contended that the trial court unlawfully increased his murder sentence from 25 to 30 years in violation of section 5-5-4(a) of the Code. *Id.* ¶¶ 26, 61. Even though his aggregate sentence decreased, he argued that a resentencing court can violate section 5-5-4(a) without increasing the aggregate sentence. *Id.* ¶ 65.

¶ 51    We rejected the defendant's arguments, finding them "entirely without merit." *Id.* ¶ 61. We acknowledged that consecutive sentences are treated as separate sentences under Illinois law, including when applying section 5-5-4(a). *Id.* ¶¶ 65-66. However, the sentence the defendant was challenging in *Agosto* did not involve consecutive sentences; rather, it involved an underlying murder charge and a weapons enhancement, which, we held, "are not treated as separate sentences when applying section 5-5-4 of the Code." *Id.* ¶ 66 (citing *People v. Taylor*, 2015 IL 117267, ¶ 21; *People v. Barnes*, 364 Ill. App. 3d 888, 897 (2006)). Significantly, we found that no Illinois court had considered a sentencing enhancement to be separate from the underlying charge (*id.* ¶ 68), and cited *Vatamaniuc* as persuasive authority (*id.* ¶ 69).

¶ 52    As in *Vatamaniuc* and *Agosto*, we reject defendant's invitation to treat an underlying murder charge and a weapons enhancement as separate sentences when applying section 5-5-4 of the Code. Here, defendant's sentence for murder was reduced from 40 to 34 years on remand. Accordingly, his argument that the resentencing court erred and violated section 5-5-4(a) by improperly increasing his sentence on remand fails. Because no error occurred, there can be no finding of plain error. See *People v. Sargent*, 239 Ill. 2d 166, 189 (2010). Similarly, where the actions complained of did not rise to the level of plain error, trial counsel's failure to object did not prejudice defendant and defendant's claim of ineffective assistance of counsel fails. See *People v. Easley*, 192 Ill. 2d 307, 332 (2000). Defendant's contention remains forfeited.

¶ 53    Defendant next contends that his 34-year sentence for first degree murder is excessive in light of the mitigating evidence presented by the defense.

¶ 54    A trial court has broad discretionary powers in imposing a sentence, and its sentencing decisions are entitled to great deference on review. *People v. Alexander*, 239 Ill. 2d 205, 212

(2010). The trial court is in a superior position to fashion an appropriate sentence based on firsthand consideration of the relevant sentencing factors, including the defendant's credibility, demeanor, moral character, mentality, social environment, habits, and age. *People v. Snyder*, 2011 IL 111382, ¶ 36. Although the trial court's consideration of mitigating factors is required, it has no obligation to recite each factor and the weight it is given. *People v. Wilson*, 2016 IL App (1st) 141063, ¶ 11. Absent some indication to the contrary, other than the sentence itself, we presume the trial court properly considered all relevant mitigating factors presented. *People v. Kindle*, 2021 IL App (1st) 190484, ¶ 67.

¶ 55 In reviewing a defendant's sentence, this court will not reweigh the aggravating and mitigating factors and substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Jones*, 2019 IL App (1st) 170478, ¶ 50. A sentencing determination will not be disturbed absent an abuse of discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). Sentences that fall within the statutory range may be deemed to result from an abuse of discretion only where they are "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." *Id.* at 210.

¶ 56 In this case, we find that the trial court did not abuse its discretion in imposing a 34-year sentence for murder.

¶ 57 The sentencing range for first degree murder is 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2022). Because the 34-year murder sentence imposed in this case is within the statutory sentencing range, it is presumed proper. See *People v. Thompson*, 2020 IL App (1st) 171265, ¶ 105.

¶ 58    Defendant does not dispute that his sentence falls within the permissible sentencing range and is presumed proper. Rather, he argues his 34-year sentence for first degree murder is excessive and an abuse of discretion in light of the mitigating evidence. He argues that the trial court "ignored or gave short shrift" to numerous factors in mitigation, including the following: (1) according to the psychiatric report, at the time of the offense, he was operating as the functional equivalent of a juvenile; (2) the psychiatric and social history reports revealed that he "essentially stood no chance from the beginning," as he grew up in a highly dysfunctional environment that included neglect and abuse by parents who used drugs and were involved in gangs; (3) the psychiatric report revealed defendant feared that, if he did not go along with his gang's plan to drive into rival territory, they would know he was working as an informant against them; (4) he expressed remorse during his interviews for both reports and at the resentencing hearing; (5) the social history report revealed that he expressed regrets about his gang tattoos; and (6) most of his infractions at IDOC were for violations of prison rules. Noting that the court stated, with regard to the changes in youth sentencing law, "The only thing I have that's different that's worthy of any consideration, of course, is exactly that," defendant asserts that the court meant that "only the change of law was worthy of consideration by the court and not the mitigation compiled in the psychological and social history reports."

¶ 59    Defendant maintains that the court focused mostly on his role as the driver and disregarded his expression of remorse. He further asserts that the court came "close to a wholesale rejection of a significant mitigating factor at resentencing" when it commented that it had to account for his and Javier's "terrible upbringing" by trying to understand "how they got to be where they are," but also remarked that it had to question how their upbringings might impact or diminish their ability

- 20 -

to be rehabilitated. Defendant argues that the court "downplayed critical information contained in the reports that detailed the devastating extent to which [he] was a product of his environment," in that his family was "missing," he was born into gang culture, and he turned to the gang for support.

¶ 60    The record demonstrates that the trial court was aware of the mitigating factors identified by defendant on appeal. The trial court received the psychiatrist's and the social worker's reports at the resentencing hearing. The psychiatric report included Dr. Byrne's conclusion that, at the time of the offense, defendant was operating as a functional equivalent to a juvenile. Both reports revealed that defendant's childhood environment was dysfunctional in that he was abused and/or neglected by his parents and was exposed to and/or participated in significant gang and criminal activity. The psychiatric report included a discussion of defendant's fear that, if he did not join his fellow gang members' plan on the day of the shooting, they would realize he was an informant. Both reports included statements that defendant had expressed remorse about the shooting, and, in allocution, defendant apologized to the murder victim's mother, Javier and his family, and his own family. The psychiatric report included information that defendant had pursued steps to have his tattoos removed, and the social worker's report related that defendant had expressed deep regret about his tattoos. Finally, the social worker's report included information about defendant's IDOC infractions, including that the "vast majority" of them were related to the violation of basic rules.

¶ 61    In addition to the reports, four of defendant's family members testified regarding the dysfunctional family dynamics that existed during defendant's childhood. Defense counsel argued in mitigation that defendant's behavior was that of "an immature child," reviewed his chaotic upbringing, and asserted that defendant was compelled to participate in the shooting because if he did not go along with the plan, other gang members would have realized he was working with the

FBI against them. Defense counsel also stressed defendant's minimal criminal history, remorse, and attempts to have his tattoos removed. Even the State observed that resentencing was to involve consideration of the *Miller* factors and recited most of them as they appear in section 5-4.5-105(a) of the Unified Code of Corrections. See 730 ILCS 5/5-4.5-105(a)(1)-(9) (West 2022). As noted above, where, as here, mitigating factors are presented, we may presume that the trial court properly considered them absent some indication to the contrary. See *Kindle*, 2021 IL App (1st) 190484, ¶ 67. We find no such indication here.

¶ 62    In this case, the trial court explained its resentencing decision in length. It discussed the change in the law regarding the sentencing of youthful offenders, noted specifically that it had to account for defendant's "terrible" upbringing, and stated it had listened to "everything that's been presented on behalf of [defendant]." However, the court also noted defendant admitted to having "misled" Javier, opined that the shooting was "a terrible act," and remarked that it had a duty to protect the public. See *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 53 ("the seriousness of an offense is considered the most important factor in determining a sentence"). Later, when denying defendant's motion to reconsider sentence, in which defendant argued the court did not properly apply the *Miller* factors, "especially as to the remorse," the court stated it had heard the evidence and considered the facts of the case, defendant's background, and "all the other circumstances involved."

¶ 63    Given that the mitigating factors defendant raises on appeal were raised in the reports presented to the court, discussed by defense counsel, and/or noted by the State, defendant essentially asks us to reweigh the sentencing factors and substitute our judgment for that of the trial court. This we cannot do. See *Jones*, 2019 IL App (1st) 170478, ¶ 50 (a reviewing court must

not substitute its judgment for that of the trial court merely because it would have weighed these factors differently). We reject defendant's arguments that the only circumstance considered by the trial court was the change in law since the original sentencing hearing, that it gave no consideration or weight to his expression of remorse, and that it engaged in "close to a wholesale rejection" of his upbringing as a mitigating factor. We cannot find that the trial court abused its discretion in imposing a 34-year sentence for first degree murder.

¶ 64    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 65    Affirmed.